In the Matter of SCHWARTZ LANDES ASSOCIATES, Respondent, v NEW YORK CITY CONCILIATION AND APPEALS BOARD, Respondent, and FOUNTAIN HOUSE, INC., Intervenor-Appellant.

First Department, May 8, 1986

### APPEARANCES OF COUNSEL

*Joseph P. Giasi, Jr.,* of counsel *(Paul F. Nash* with him on the brief; *Turk, Marsh, Kelly & Hoare,* attorneys), for intervenor-appellant.

*John P. Sheridan* of counsel *(Scott E. Mollen* and *C. Daniel Chill* with him on the brief; *Graubard Moskovitz Dannett Horowitz & Mollen,* attorneys), for Schwartz Landes Associates, respondent.

### OPINION OF THE COURT

MURPHY, P. J.

Intervenor Fountain House is a nonprofit charitable corporation. Its purpose is to aid in the rehabilitation of formerly institutionalized psychiatric patients. Toward this end, Fountain House has, since 1968, rented 17 apartments from petitioner. These apartments are used to house recently discharged psychiatric patients during their sometimes lengthy transition to life outside institutional confines. The individuals residing in these apartments contribute toward payment of the rent, share housekeeping responsibilities, and participate otherwise in community activities and duties. They are thus afforded an opportunity to readjust to the rigors of society at large in a supervised, humane and socially supportive setting. Given the often precarious economic and social circumstances of these individuals, it is, at the very best, improbable that they would on their own be able to obtain housing comparably suited to their special needs.

The leases by which Fountain House has rented the subject

apartments all stipulate that the apartments will be occupied by persons designated by Fountain House. The class of occupants is limited to Fountain House members, associates, staff and "family". All of the apartments are rent stabilized.

In 1981, petitioner applied to the Conciliation and Appeals Board (CAB) pursuant to Code of the Rent Stabilization Association of New York City, Inc. (Rent Stabilization Code) § 54 (E) for permission to deny Fountain House renewal leases on the ground that Fountain House, a corporation, was not using the apartments for primary residential purposes. In denying petitioner's application, the CAB noted, "The record shows that the occupants maintain their primary residence in the subject apartments; that in fact the underlying leases recognized that the subject apartments would be occupied by employees, staff and persons associated with the tenant, Fountain House, Inc.; and the tenant submitted an uncontroverted list of the Fountain House members who reside in the subject apartments and it is clear their residence is primary and continuous." (CAB Opn No. 25,648.)

Special Term reviewed the CAB determination in a CPLR article 78 proceeding (124 Misc 2d 1067). It vacated the determination, citing *Matter of Cale Dev. Co. v Conciliation & Appeals Bd.* (94 AD2d 229) for the proposition that the Rent Stabilization Law was not enacted with the intention of putting apartments in "perpetual trust" for whomever a corporate tenant might designate *(supra,* at p 235). Special Term also cited Appellate Term's decision in *Koenig v Jewish Child Care Assn.* (NYLJ, Nov. 26, 1984, p 13, col 1) in support of the notion that group homes run for charitable purposes are not among the parties whose protection the Rent Stabilization Code was designed to ensure. Though *Koenig* is discussed at greater length below, we note here that since Special Term's decision, Appellate Term's ruling in *Koenig* has been reversed by this court (107 AD2d 542 [1st Dept 1985]).

In determining the issue before us, i.e., under what circumstances a corporate tenant may be denied a lease renewal under the Rent Stabilization Code on grounds of nonprimary residency, two kinds of inquiries must be made. First, it must be ascertained what individual or individuals are contractually designated by the corporate tenant and landlord to occupy the premises, and if, in fact, those individuals are the occupants. *(See, e.g., Matter of Cale Dev. Co. v Conciliation & Appeals Bd., supra,* at pp 232-235.) Secondly, assuming the occupants are the intended beneficiaries of the corporate

tenancy, it must be determined if they are using the premises as a primary residence. If the premises are being used as the primary residence of the contractually designated parties then a rent-stabilized lease renewal must be offered. *(Matter of Sommer v New York City Conciliation & Appeals Bd.,* 116 AD2d 457 *[Sommer III]; Matter of Sommer v New York City Conciliation & Appeals Bd.,* 99 AD2d 991 [1st Dept 1984] *[Sommer II]; Matter of Cale Dev. Co. v Conciliation & Appeals Bd.,* 94 AD2d 229 [1st Dept 1983], *affd* 61 NY2d 976; *Matter of Sommer v New York City Conciliation & Appeals Bd.,* 93 AD2d 481 [1st Dept 1983], *affd* 61 NY2d 973 *[Sommer I].)*

The above-cited line of cases extending from *Sommer I* to *Sommer III* establishes unequivocally that a corporate tenant has a right to renew its rent-stabilized lease provided it can meet the primary residence test set forth in Rent Stabilization Code § 54 (E). In adhering to this position, we recognize that it is not the corporation which resides in the apartment but an individual or individuals whom the corporate tenancy was intended to benefit *(see, Matter of Cale Dev. Co. v Conciliation & Appeals Bd., supra,* at p 233). The identity of the intended beneficiaries of a corporate tenancy must be established by reference to the lease; it is contractually determined. Clearly, if the occupants of rent-stabilized premises during a corporate tenancy are not those designated by the parties to the lease then there is no obligation on the landlord's part to offer a new lease. In *Cale,* for example, the corporate tenant specified that only Mr. and Mrs. Castle would occupy the subject rent-stabilized apartment. The corporate tenant was denied the right to renew the lease because the Castle's son, who had no right of occupancy under the lease, lived in the apartment instead of his parents who maintained their primary residence elsewhere *(supra,* at p 234). An evaluation of primary residency is pertinent only as to those who may, pursuant to the lease, occupy the premises *(supra).* Where, as in *Cale,* it is initially determined that the primary occupants are other than those authorized by the lease no further inquiry need be made. That is not the case here since it is undisputed that all the subject occupancies are authorized by the applicable leases.

Rather, the question initially posed by the present case, not directly addressed by our previous opinions, is whether a rent-stabilized corporate tenancy such as the one at issue need be renewed when it benefits a class of unnamed individuals, as opposed to parties specifically named in the lease. Contrary to

petitioner's argument, this court has never held that only named individuals may be authorized occupants under a rent-stabilized corporate tenancy. As recently as our decision in *Cale (supra)*, we left open the possibility that a class rather than specified persons might be authorized occupants for renewal purposes. We stated, "Where, as here, a corporate tenant enters into a written lease designating specific individuals *rather than a class of individuals* as the sole occupants of the apartment, the determination of primary residence, and with it the right to renewal, turns on the primary residence of the occupants named in the lease and no one else." *(Matter of Cale Dev. Co. v Conciliation & Appeals Bd., supra,* at p 234; emphasis added.) Still more recently, in *Koenig v Jewish Child Care Assn. (supra)*, we held that residents of a group home referred to in the rent-stabilized lease simply as the "family" of the nonprofit corporate tenant, were entitled to all the rights of a family under the Rent Stabilization Code *(Koenig v Jewish Child Care Assn., supra,* at p 545). It was, therefore, implicit in our *Koenig* holding that the occupancy of a class whose members are not individually named in the lease, does not of itself relieve the landlord of its renewal obligation.

Although we think the "families" referred to in the Fountain House lease with petitioner are essentially indistinguishable from the family deemed entitled to Rent Stabilization Code protection in *Koenig (supra)*, we do not ultimately find it necessary to characterize the Fountain House residents as a family pursuant to Social Services Law § 371 (17) *(see, Little Neck Community Assn. v Working Org. for Retarded Children,* 52 AD2d 90 [2d Dept 1976])*, as was done in *Koenig* to sustain corporate tenant Fountain House's right to renewal of its rent-stabilized leases.

A class designated by the corporate tenant may be as worthy of Rent Stabilization Code protection as named individuals regardless of whether the class is of a familial sort. Assuming that the resident is a member of the class the lessor and lessee have agreed is to benefit from the corporate tenancy, it is of no importance whether the resident is named or lives in a family group. The fundamental inquiry is rather whether the resident uses the rent-stabilized quarters as a primary dwelling.

The central purpose of the 1971 amendment to the Local Emergency Housing Rent Control Act of 1962 allowing decontrol of accommodations not used as primary residences (L

1971, ch 373, § 2, amending L 1962, ch 21, § 1 [5]) was to help ensure that the continuing shortage of residential housing was not exacerbated by tenants using their rent-controlled and rent-stabilized apartments only occasionally for convenience or for storage. (1971 NY Legis Ann, at 562.) It was hoped that gradual decontrol, accomplished without compromising legitimate tenant protections, would augment the supply of residential units by returning underutilized apartments to the market *(id.,* at 314). Increased rentals following from decontrol would, it was anticipated, spur renewed interest in real estate investment and stem the widespread abandonment and decay of residential buildings. *(See,* Governor's memorandum of approval of L 1971, chs 371-374, 1971 McKinney's Session Laws of NY, at 2608-2610.) The subject amendment also sought to eliminate the indirect subsidization of rent-regulated residences through reduced real estate taxes where the tenant beneficiaries of the subsidy were undeserving of Emergency Housing Rent Control Act coverage. (1971 NY Legis Ann, at 562.) Enactment of the nonprimary residence amendment to the Emergency Housing Rent Control Act was followed by the adoption of Rent Stabilization Code § 54 (E) entitling an owner to refuse to offer a lease renewal to a tenant where the tenant has not maintained his or her primary residence in the rent-stabilized accommodation.

Although there were numerous incidental benefits anticipated from the nonprimary residence amendment to the Emergency Housing Rent Control Act, it is apparent that the primary objective was to ensure that rent-regulated units were properly utilized as primary residences. The law does not directly facilitate any other end. It does not guarantee an owner increased rental revenues or more frequent turnovers in tenancies except where a tenancy may be successfully challenged on the ground of nonprimary residency.

The CAB's finding in this case that the Fountain House apartments are occupied as primary and continuous residences is unquestionably supported by substantial evidence and must, therefore, be accepted by this court *(300 Gramatan Ave. Assoc. v State Div. of Human Rights,* 45 NY2d 176 [1978]). Fountain House made an uncontroverted showing before CAB that all the apartments in question were used as primary residences. We note that 12 of the 17 apartments had been occupied by the same individuals for at least five years and that three of the occupants resided in their apartments for more than seven years. This is hardly indicative of the

transient tenancies suggested, without basis, by petitioner. Indeed, though it was petitioner's burden to do so it made no showing to support its claim of nonprimary residency.

Despite its utter failure to adduce evidence demonstrating the temporary and nonprimary nature of the residencies at issue, petitioner maintains that this case is controlled by *Matter of Walter & Samuels v New York City Conciliation & Appeals Bd.* (81 AD2d 212 [1st Dept 1981]) where we held that the Syrian mission to the United Nations was not entitled to lease rent-stabilized accommodations to house whoever might temporarily occupy the post of Syrian Ambassador to the United Nations. As the residencies here are not of a temporary sort, *Walter & Samuels* has no application. Moreover, to the extent that *Walter & Samuels* applied the permanent residency test to the mission rather than the designated occupant of the apartment, its analysis has been replaced by that employed in subsequent decisions clearly focusing upon the nature of the residency maintained by those authorized to occupy the accommodation during the corporate tenancy. *(See, Matter of Sommer v New York City Conciliation & Appeals Bd., supra,* at p 484 [1st Dept 1983] *[Sommer I]; Matter of Cale Dev. Co. v Conciliation & Appeals Bd., supra,* at pp 232-233; *Matter of Sommer v New York City Conciliation & Appeals Bd., supra,* at pp 992-993 *[Sommer II]; Koenig v Jewish Child Care Assn., supra,* at p 544; *Matter of Sommer v New York City Conciliation & Appeals Bd., supra,* at p 459 *[Sommer III].)* We note further that *Walter & Samuels* has twice been expressly limited to its particular facts insofar as it conflicts with the long line of precedent stemming from *Sommer I. (See, Matter of Cale Dev. Co. v Conciliation & Appeals Bd., supra,* at p 232; *Sommer II, supra,* at p 993.) Petitioner's reliance upon *Walter & Samuels* as "controlling" law is clearly misplaced.

Perhaps it is the case, as was observed in *Walter & Samuels (supra)* that the Rent Stabilization Law and Code are not designed for the protection of diplomatic missions *(but see, Sommer II, supra).* That is, however, very much beside the point. Those most vitally benefited by rent-stabilization protection and adversely affected by their removal are the tenants in occupancy, not the corporate tenants of record. It is not the corporation which faces physical eviction upon nonrenewal of a rent-stabilized lease, but the occupant beneficiary of the corporate tenancy. For this reason when an owner seeks to extinguish a rent-stabilized corporate tenancy on the ground of nonprimary residency, the ultimate determination is not

based on the fact that the Rent Stabilization Law was not intended to protect corporations, an irrelevancy we can concede, but rather on whether the authorized occupants are, in fact, maintaining their primary residence at the rent-stabilized premises and can, therefore, justifiably claim continued protection. It is but a truism that, as petitioner states, "[E]mergency rent laws were passed to protect people not corporations." What is really at issue when any tenancy, corporate or otherwise, is challenged on grounds of nonprimary residency, is whether the people actually being protected, assuming them to be authorized occupants of the premises, merit such protection by virtue of their compliance with the primary residency requirement of the Rent Stabilization Code.

This is, of course, a determination to be made on an individual basis. In the present case, however, we cannot ignore that in addition to meeting the primary residency requirement as individuals, the Fountain House members, whose eviction is sought, constitute a group laying a particularly urgent and morally compelling claim to continued rent-stabilized protection. There is no group in our society more desperately in need of affordable residential accommodation than those negotiating the perilous transition between in-patient psychiatric institutions and the extra-institutional world. It is a public tragedy of scandalous dimensions that those discharged from institutions, often poor in resources and of fragile psychiatric constitution, have so frequently been relegated to unseemly single-room occupancies or to the growing ranks of the homeless. The shortage of suitable residential housing has not been felt more acutely by any other group. Though we do not suggest that this very difficult problem is soluble by administration of the emergency tenant protection laws, we recognize that it will be unnecessarily exacerbated if in unwarranted zeal to prevent corporate benefit we sanction the removal of rent-stabilization protections from the very people in most dire need of them. Fortunately, the law requires no such result.

The underlying question in this dispute is not really whether a benefit is being inappropriately conferred upon a corporation, but whether an owner should be forced to shoulder the economic burden of an extended rent-stabilized tenancy. We can only comment that the present case is no different from any other where the tenant remains in residency for a long period of time. The burden imposed by

continued rent regulation must be borne in the first instance by the owner. The fact that a corporate tenancy is involved does not change matters provided the designated occupants maintain their primary residence at the rent-stabilized accommodation. *(See, Sommer I,* 93 AD2d 481, *supra; Matter of Cale Dev. Co. v Conciliation & Appeals Bd., supra; Sommer II,* 99 AD2d 991, *supra; Sommer III,* 116 AD2d 457, *supra.)* As noted previously, what distinguishes this case is that the lease designates a class rather than specific individuals thus raising the possibility that the rent-stabilized tenancy might extend indefinitely. We are, therefore, asked to protect the owner from the inequities of prolonged rent regulation. We declined to afford the owner such protection in *Koenig* (107 AD2d 542, *supra)* and see no reason to do so now. Relief from hardships caused by rent stabilization cannot be afforded a landlord in the context of a nonprimary residency challenge except where the essential element of such a challenge, namely, that the accommodation is not being utilized as a primary residence, has been demonstrated. It bears repetition that the nonprimary residence law is principally concerned with returning underutilized apartments to the marketplace. Absent underutilization, deregulation and the consequent benefits to the owner are simply not sanctioned.

Of course, there is nothing to prevent an owner from protecting itself from an indeterminate corporate tenancy by negotiating a lease specifying exactly which individuals may occupy the premises. But where, as here, the owner fails to take obvious measures to retain control over occupancy during a corporate tenancy, we cannot restore by means of the nonprimary residency law what has been voluntarily surrendered by contract. A fortiori, we cannot make the owner's apparent failure to safeguard its interests an automatic ground for complete or partial decontrol of rent-stabilized premises. The nonprimary residence law does not operate to transform an otherwise renewable lease in favor of a corporate tenant of rent-stabilized accommodations into a lease nonrenewable at the owner's option simply because the parties have not named the occupants but have instead designated a class. An owner may be adversely affected by the agreement entered into with the corporate tenant, but such adversity is in no way indicative of nonprimary residency and does not, therefore, constitute a basis for removing rent law protection pursuant to Rent Stabilization Code § 54 (E). We have previously held that provisions of the Rent Stabilization

Code, including section 54 (E), facilitating the termination of tenancies run counter to the fundamental purpose of the rent laws which is to protect tenants from dispossession. *(Sommer I, supra,* at p 485.)* These exceptional provisions are accordingly to be strictly construed to limit their application to clearly appropriate circumstances *(supra).* Petitioner's claim that it will suffer economic harm is not a circumstance justifying nonrenewal pursuant to Rent Stabilization Code § 54 (E). That provision is not a vehicle for the general redress of inequities brought about by rent regulation and is even less appropriately employed to enable an owner to avoid the consequences of a lease it has freely executed. Only where the owner has carried its burden and demonstrated the nonprimary residency of the tenant does Rent Stabilization Code § 54 (E) offer a means to relief.

Here, it is undisputed that the occupants of the apartments in question are all members of the class lessor and lessee agreed would benefit from the corporate tenancy as staff, associates, members, or "family" of the tenant of record, Fountain House. As all the occupancies are authorized by the lease, the corporate tenant has a clear right to renewal of its lease pursuant to Rent Stabilization Code § 60 provided the nature of the occupancies are residential and primary. Fountain House's showing before CAB leaves no doubt that the apartments at issue are in fact occupied by its staff, members, associates, and family as primary residences.

Accordingly, Fountain House must be offered rent-stabilized lease renewals. These are to run prospectively from the date executed lease copies are delivered to the tenant. *(Matter of Briar Hill Apts. v Conciliation & Appeals Bd.,* 44 AD2d 816.)

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Richard Lee Price, J.), entered September 14, 1984 vacating respondent CAB's determination and directing that petitioner Schwartz Landes Associates is entitled not to renew intervenor Fountain House's leases on 17 apartments at 424 West 47th Street in New York City, should be reversed, on the law, without costs, and the determination of the CAB reinstated in its entirety.

Asch, J. (dissenting). I would affirm the order of Special Term (124 Misc 2d 1067) directing the respondent Conciliation and Appeals Board (or its successor, the New York State Division of Housing and Community Renewal) to issue an order granting permission to the petitioner not to offer renewal leases to the tenant.

Petitioner landlord owns a building in which 17 apartments are leased to the corporate tenant, Fountain House. The tenant, an eleemosynary institution, designates the occupants of the apartments from among psychiatric patients who may temporarily need housing during their period of rehabilitation. These patients occupy the apartments on a transient basis, and once "rehabilitated", lose their right to occupy the apartments.

It is clear that the corporate tenant is not a person occupying the apartments as its primary residence. Thus, in *Matter of Cale Dev. Co. v Conciliation & Appeals Bd.* (94 AD2d 229, *affd* 61 NY2d 976), this court held that a corporation was not entitled to a lease renewal where the actual occupant was not the president of the corporation for whose benefit the apartment had been leased. Justice Sullivan noted, for the court, that: "While * * * a corporate tenant is entitled to a renewal lease provided it can meet the primary residence test, rent stabilization was never intended to place such a tenant's leasehold estate in perpetual trust for the benefit of whomever, at a particular point in time, might happen to occupy a corporate office." *(Matter of Cale Dev. Co. v Conciliation & Appeals Bd., supra,* at pp 234-235; *see also, Matter of Walter & Samuels v New York City Conciliation & Appeals Bd.,* 81 AD2d 212, *appeal dismissed* 55 NY2d 824.)

*Koenig v Jewish Child Care Assn.* (107 AD2d 542) does not hold to the contrary. In *Koenig,* eviction was sought by the landlord on the grounds the apartment occupied as a group home was used "for commercial purposes". The court held that the tenant in the maintenance of a group home was not engaged in a commercial activity and that the home could be evicted only "upon a showing that petitioner had met the requirements of the Code of the Rent Stabilization Association of New York City, Inc. § 54 (A)" *(supra,* at p 545). The court found that petitioner landlord had not made this showing and, accordingly, was not entitled to possession.

In addition, Laws of 1983 (ch 403, § 55) amended Emergency Tenant Protection Act of 1974 (L 1974, ch 576, § 4) § 5 (a) (11) to exempt from its coverage "(11) housing accommodations which are not occupied by the tenant, *not including subtenants or occupants,* as his primary residence" (emphasis added). The focus of the exemption is upon the party in privity with the landlord, i.e., the tenant named in the lease.

Laws of 1984 (ch 940, § 3) once again amended Emergency

Tenant Protection Act § 5 (a) (11) by providing that "where a housing accommodation is rented to a not-for-profit hospital for residential use, affiliated subtenants authorized to use such accommodations by such hospital shall be deemed to be tenants". This single type of nonprofit entity is exempted from the general rule that the issue of primary residence is determined by reference to the tenant of record. This single expressed exemption thus precludes the exemption of other entities pursuant to the statutory construction maxim of *expressio unius est exclusio alterius. (See also, Matter of Sommer v New York Conciliation & Appeals Bd.,* 116 AD2d 457.)

It seems significant that the Court of Appeals has held the term "tenant" must be strictly limited under rent stabilization so that even family members have no right to a lease renewal upon the tenant's departure *(Tagert v 211 E. 70th St. Co.,* 63 NY2d 818, 821; *Sullivan v Brevard Assoc.,* 66 NY2d 489).

Ross and ELLERIN, JJ., concur with MURPHY, P. J.; KUPFERMAN, J., concurs on constraint of *Koenig v Jewish Child Care Assn.* (107 AD2d 542); ASCH, J., dissents in a separate opinion.

Order and judgment (one paper), Supreme Court, New York County, entered on September 14, 1984, reversed, on the law, without costs and without disbursements, and the determination of the respondent CAB reinstated in its entirety.