■ AMIR MANOCHERIAN et al., Appellants, v LENOX HILL HOSPITAL et al., Respondents, et al., Defendants. [602 NYS2d 93] —Order and judgment (one paper), Supreme Court, New York County (Myriam Altman, J.), entered January 8, 1993, affirmed for the reasons stated by Altman, J., without costs and disbursements. Concur—Ellerin, Kupferman and Asch, JJ.

Sullivan, J. P., and Ross, J., dissent in a memorandum by Sullivan, J. P., as follows: In this declaratory judgment action to determine, *inter alia,* whether Lenox Hill Hospital is entitled to renewal leases to six rent stabilized apartments at 420 E. 79th Street in New York City, the IAS Court and, in affirming, the majority, interpret chapter 940 of the Laws of 1984 so that renewal leases to the six apartments in question, as well as 48 others similarly affected, must be offered to Lenox Hill effectively in perpetuity.

At issue is the proper interpretation of chapter 940, an amendment to the Rent Stabilization Law and the Emergency Tenant Protection Act applicable only to a not-for-profit hospital, such as Lenox Hill, which leases, and, in turn, subleases, rent stabilized apartments for the use of "affiliated" subtenants. Chapter 940 provides that stabilization coverage will continue as long as the subtenant of the apartment is a primary resident. In all other instances of rent stabilization, it is the prime tenant who must reside in the apartment to maintain stabilization protection. Thus, since chapter 940 provides an exception for non-profit hospitals in determining primary residence, Lenox Hill, a corporation which could never be a primary resident of a rent stabilized apartment, is ensured of a continued supply of rent stabilized apartments.

Plaintiffs (the owner) acquired the building in question on April 1, 1976, subject to a lease between Lenox Hill and their owner predecessor entered into during the 1960's, prior to the enactment of the Rent Stabilization Law, effective as to these apartments on May 6, 1969, with respect to 18 apartments. The owner asserts that any interpretation of chapter 940 that permits Lenox Hill, an entity with an interminable corporate existence, to lease these apartments in perpetuity results in a regulatory taking since it is permanently deprived of its reversionary interest in the property, i.e., the expectancy that it will one day recover possession of the apartments to dispose of as it sees fit, and since no legitimate State interest is served by allowing the hospital to circumvent the Rent Stabilization Law by using the apartments in question as transient dormitory space for an ever changing succession of nurses.

A brief history of chapter 940 is in order to put the facts and procedural background of this case in proper perspective. Laws of 1971 (ch 373, § 2) amended the State enabling act for rent control and rent stabilization (L 1962, ch 21, also known as the Local Emergency Housing Rent Control Act) to exempt from regulation all housing accommodations "not occupied by the tenant in possession as his primary residence." The same language was used in section 5 (a) (11) of the Emergency Tenant Protection Act of 1974 (L 1974, ch 576, § 4 [ETPA]), which exempted newly stabilized units. The phrase "tenant in possession" was considered as encompassing a subtenant. Thus, the non-primary residence exemption was inapplicable if a subtenant in possession used the apartment as his primary residence.

Laws of 1983 (ch 403, § 41 [also known as the Omnibus Housing Act (OHA)]) amended Administrative Code of the City of New York § YY51-3.0 (a) (1) (f) (renum § 26-504 [a] [1] [f]) to exempt from the Rent Stabilization Law dwelling units "not occupied by the tenant, not including subtenants or occupants, as his primary residence, as determined by a court of competent jurisdiction." Thus, for purposes of the non-primary residence exemption, the named tenant himself had to occupy the apartment as a primary residence. No longer could he qualify for the benefits of rent stabilization, including the offer of a renewal lease, merely because a subtenant used the apartment as his primary residence.

OHA's restrictions on primary residence and subletting had an obvious adverse effect on Lenox Hill, which, for several years, had been subleasing rent stabilized apartments as dormitory space for its nurses. Lobbying the Legislature for

relief so that safe, convenient and affordable housing would be available for its staff who are required to work evening shifts, Lenox Hill played a key role in introducing chapter 940 (see, *520 E. 81st St. Assocs. v Lenox Hill Hosp.,* 142 Misc 2d 723, 725, *revd* 157 AD2d 138, *revd on other grounds* 77 NY2d 944 *[Lenox Hill I]*).

Section 1 of chapter 940 amended the non-primary residence section of the Rent Stabilization Law, section YY51-3.0 (a) (1) (f) of the Administrative Code (renum § 26-504 [a] [1] [f]), to add, "[W]here a housing accommodation is rented to a not-for-profit hospital for residential use, affiliated subtenants authorized to use such accommodations by such hospital shall be deemed to be tenants." Section 3 of chapter 940 amended section 5 (a) (11) of the ETPA to add the same language. Thus, by virtue of chapter 940, subtenants of not-for-profit hospitals, which, pursuant to the OHA, could not be considered as "tenants" for the purposes of the non-primary residence exemption, were deemed tenants for determining primary residence.

Sections 2 and 4 of chapter 940 further amended the Rent Stabilization Law and the ETPA to give a not-for-profit hospital the right to sublet its apartments to affiliated employees without first obtaining the owner's consent. In addition, unlike other tenants, who have the right to sublet for only two out of every four years, the duration of the not-for-profit hospital's subletting was completely unrestricted.

Of the six leases at issue, five were rented to Lenox Hill pursuant to leases dated July 5, 1973 and most recently renewed for two-year periods expiring August 30, 1991. These leases say nothing about Lenox Hill's right to sublet to affiliated employees; they provide that the apartment "shall be occupied only by Tenant [Lenox Hill] and the members of the immediate family of Tenant." According to the leases, subletting is permitted only with the prior written consent of the landlord. The most recent rent stabilized renewal lease for the sixth apartment expired on December 31, 1991. Pursuant to its housing program, Lenox Hill used all of the apartments for members of its nursing staff.

After service of the appropriate "window period" notice, the owner commenced two actions, now consolidated pursuant to stipulation, against Lenox Hill, the State of New York and the affected subtenants, one with respect to five of the leases at issue and the other with respect to the sixth, for a declaration, *inter alia,* that Lenox Hill was not entitled to a renewal lease.

After joinder of issue by Lenox Hill, the State, by stipulation, remaining a nominal defendant solely to defend the constitutionality of chapter 940 and the subtenants neither appearing or answering, the owner moved for summary judgment. Lenox Hill and the State thereafter cross-moved for summary judgment.

The IAS Court granted summary judgment to Lenox Hill and the State, finding that chapter 940 was not constitutionally infirm to the extent that it required the owner to offer leases in perpetuity to Lenox Hill. Insofar as is relevant to this appeal, the IAS Court rejected the owner's regulatory taking claim, finding that chapter 940 satisfied the first of the Supreme Court's two-prong test for determining whether a regulatory taking has occurred in that, in curbing oppressive conduct and profiteering by landlords, thus providing protection to Lenox Hill and its employees and promoting the "health and welfare" of the general public by permitting non-profit hospitals to obtain for their medical personnel housing which might not otherwise be available, it substantially advanced a legitimate State interest. The court rejected the argument that Lenox Hill had a perpetual corporate existence and that an interpretation of chapter 940 which compelled the offer of a renewal lease to Lenox Hill extinguished the owner's reversionary interest in its property, finding that the Rent Stabilization Law "allows continuing occupancy by primary resident tenants and their family members under circumstances which might very well be perpetual." Thus, the court found that the owner had failed to show that it had been deprived of its reversionary interest in the apartments any more so than if it had rented to individual tenants. Since, in my view, the IAS Court's premises in its regulatory taking analysis do not withstand scrutiny and chapter 940 fails both aspects of the two-pronged test for determining whether the constitutional guarantee against an uncompensated taking has been violated, I would reverse.

In *Seawall Assocs. v City of New York* (74 NY2d 92, 107, *cert denied* 493 US 976), the Court of Appeals summarized the two-pronged test for determining whether a regulatory taking has occurred: "[T]he constitutional guarantee against uncompensated takings is violated when the adjustment of rights for the public good becomes so disproportionate that it can be said that the governmental action is 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole' *(Armstrong v United States* [364 US 40], at 49). * * * It is basic * * * that * * * a burden-

shifting regulation of the use of private property will, without more, constitute a taking: (1) if it denies an owner economically viable use of his property, *or* (2) if it does not substantially advance legitimate State interests [citations omitted]. Either would be sufficient to invalidate a property-use regulation." (Emphasis in original; *see also, Nollan v California Coastal Commn.,* 483 US 825, 834; *Keystone Bituminous Coal Assn. v DeBenedictis,* 480 US 470, 485, 495; *Agins v Tiburon,* 447 US 255, 260.)

With respect to the "legitimate State interest" aspect of the two-pronged test, it is important to note that chapter 940 applies only to apartments sublet to the affiliated employees of a not-for-profit hospital. Thus, should the subtenant, whether through retirement or a change of job, cease his or her employment with Lenox Hill, the lease tenant, he or she must voluntarily vacate or be evicted. In *Lenox Hill I* (157 AD2d 138, *supra),* which involved the same issue, this Court noted with respect to the subtenants of the 39 apartments at issue that their employment at Lenox Hill was rather transitory, and that during the term of the last renewal leases there was a turnover in one-third of the apartments *(supra,* at 144). If, as the IAS Court has held, chapter 940 requires the owner to offer renewal leases to Lenox Hill, whose employees, when they lose or leave their jobs, also lose their right to occupy the apartments, irrespective of how long they have lived there, then the very purpose of the Rent Stabilization Law, which was enacted to alleviate a severe housing shortage *(see,* Administrative Code § 26-501; McKinney's Uncons Laws of NY § 8622 [ETPA § 2]), is being contravened. A statutory interpretation which encourages the deployment of rent stabilized apartments in perpetuity as temporary dormitory space for an ever changing roster of hospital employees and promotes the displacement of these employees, some of whom may be long-term tenants, when they leave their employment does a disservice to rent stabilization's underlying purpose of protecting residential tenants from evictions during an acute housing shortage. *(See, Sterling v Lapidus,* 10 AD2d 180, 185; *Suppus v Bradley,* 278 App Div 337, 338-339.) Rather than serve the concept of tenant protection, such an interpretation would encourage the eviction of tenants in occupancy in favor of a corporate tenant, whose occupancy is, at best, constructive. It was never the purpose of rent regulation to protect corporations, but rather individuals. *(Matter of Schwartz Landes Assocs. v New York City Conciliation & Appeals Bd.,* 117 AD2d 74, 81.)

Lenox Hill attempts to justify the IAS Court's interpretation by arguing that, given the severe nursing shortage, the shortage of available apartments and the limited financial resources available to hospitals, chapter 940 promotes the public welfare by providing it with apartments which might not otherwise be available. Without characterizing it as such, Lenox Hill is advancing a health care emergency argument. It should be noted that the Legislature has never declared a health care emergency. Nor has Lenox Hill cited any legislative history to support its theory as to what ills the statute was intended to cure. Moreover, chapter 940 is a provision of the Rent Stabilization Law, which was enacted to ameliorate a housing emergency, not to promote health care. Emergency legislation should not be extended beyond the problem sought to be remedied. *(See, People ex rel. McGoldrick v Regency Park,* 201 Misc 109, 111, *affd* 280 App Div 804, *affd* 305 NY 650.)* "Nor should the policy of promoting better health care be furthered by interpreting the Rent Stabilization Law so as to exacerbate the very housing emergency which rent stabilization was enacted to address." *(520 E. 81st St. Assocs. v Lenox Hill Hosp.,* 157 AD2d, *supra,* at 150.)

With respect to the claim that chapter 940 was intended to help it "retain and attract staff", Lenox Hill does not need below-market rent stabilized apartments to attract nurses; it needs apartments, which it can obtain by making a capital investment in housing. Thus, what is at stake here is not Lenox Hill's ability to attract nurses but, rather, the cost of doing so. In that regard, it stresses the fact that it is "entirely dependent on government health care reimbursement rates." Lenox Hill, however, fails to show how the enormous and complex problem of health care costs will be solved by saving one hospital the difference between rent stabilized rents and market rents for a handful of apartments. There is no showing in this record as to how many apartments, other than the 54 leased by Lenox Hill, are affected by chapter 940.

In *Nollan v California Coastal Commn.* (483 US 825, *supra),* the Supreme Court emphasized the level of scrutiny that must be applied in weighing the "legitimate State interest" test. "We have required that the regulation 'substantially advance' the 'legitimate state interest' sought to be achieved [citation omitted], not that 'the State *"could rationally have decided"* that the measure adopted might achieve the State's objective.' " *(Supra,* at 834, n 3, quoting Brennan, J.'s dissent, at 843, quoting *Minnesota v Clover Leaf Creamery Co.,* 449 US 456, 466.) Recent Supreme Court cases have bolstered the view

that a heightened scrutiny is applicable to a claim of legitimate State interest in takings claims. In *Lucas v South Carolina Coastal Council* (505 US —, 112 S Ct 2886), the Court held that a legislative claim of advancing a legitimate State interest could not be taken at face value when analyzing whether a regulatory taking had occurred. "Since [a harm-preventing] justification can be formulated in practically every case, this amounts to a test of whether the legislature has a stupid staff. We think the Takings Clause requires courts to do more than insist upon artful harm-preventing characterizations." (505 US, *supra,* at —, n 12, 112 S Ct, *supra,* at 2898, n 12.)

Finally, even if chapter 940 could be considered as substantially advancing a legitimate State interest by alleviating a health care crisis, there is no justification for placing the burden of such remedial legislation on this owner and others similarly situated, who would thereby be compelled to " 'dedicate their properties to a public purpose' and bear a public burden which should be borne by society at large." *(520 E. 81st St. Assocs. v Lenox Hill Hosp.,* 157 AD2d, *supra,* at 149, quoting *Seawall Assocs. v City of New York,* 74 NY2d, *supra,* at 114.)* If the Legislature determines to provide inexpensive housing for hospital employees it may, of course, subsidize Lenox Hill or its nurses in a variety of ways. But if it shifts the burden of that subsidy to individuals rather than the public at large, it must do so within constitutional limits.

Although, under this analysis, there is no need to reach the second prong of the regulatory takings test, whether chapter 940 deprives the owner of the economically viable use of his property, any interpretation of chapter 940 that requires the owner to offer Lenox Hill renewal leases in perpetuity extinguishes the owner's reversionary interest in the property, i.e., its eventual recovery of the apartments to use as it sees fit. "Even in rent-regulated apartments, a landlord has a reasonable expectation, at some point, of a vacancy, which will result in a reversion of possession to him." *(520 E. 81st St. Assocs. v Lenox Hill Hosp., supra,* at 150.) As was said of chapter 940 in *Lenox Hill I (supra,* at 150): "If only a single element of an owner's 'bundle of property rights' is extinguished, there has been a regulatory taking under [this] prong. *(See, Hodel v Irving,* 481 US 704; *see also, Seawall Assocs. v City of New York, supra,* 74 NY2d, at 110.)"

An owner who rents to an individual has the expectation, even with liberal succession rules, that an apartment will eventually revert back to his control. In fact, of the six nurse-

subtenants in possession of these apartments in December 1972, only one is in occupancy today. The other apartments have had multiple occupants. But, while individual tenants will die or move away, Lenox Hill, in existence over 75 years, since June 29, 1918, will not. Thus, there is no merit to the argument, accepted by the IAS Court, that under rent stabilization an owner is no more likely to realize a reversionary interest in an apartment rented to an individual than in one of the apartments rented to Lenox Hill. In *Rent Stabilization Assn. v Higgins* (164 AD2d 283, 298), this Court, in another context, pointedly observed that while a landlord who rents to Lenox Hill is deprived of its reversionary interest in perpetuity, the use of the property in perpetuity by an individual tenant "is simply not a potential result."

Nor is there any merit to Lenox Hill's argument that the owner has not lost its reversionary interest because rent regulation is not permanent. Among the provisions of Local Laws, 1987, No. 9 of the City of New York, invalidated in *Seawall Assocs. v City of New York* (74 NY2d 92, *supra),* was a five-year moratorium on the conversion, alteration and demolition of single room occupancy properties. As with the Rent Stabilization Law, the moratorium provided for subsequent renewals, "as the City Council deems necessary" *(supra,* at 100). Despite the "temporary" nature of the enactment, the Court of Appeals found a taking, both physical and regulatory. As a practical matter, as with Lenox Hill's existence, there seems to be no foreseeable end to rent regulation. Ironically, the cases cited by Lenox Hill in support of the proposition that rent regulation is of temporary duration, i.e., *Loab Estates v Druhe* (300 NY 176), *Teeval Co. v Stern* (301 NY 346) and *Lincoln Bldg. Assocs. v Barr* (1 NY2d 413), were decided in 1949, 1950 and 1956, respectively.

In the normal lease arrangement, even under rent stabilization, an owner has the right to reenter his own property, to rehabilitate vacant apartments and increase rents in accordance with stabilization guidelines, combine adjoining apartments and raise the rent to market rates, subject thereafter to stabilization guidelines, and to utilize vacant apartments for the personal use of family members. Here, the owner's future right to reassert its domain over the property with respect to any of these rights is lost.

Lenox Hill argues that an owner's reversionary interest in a rent stabilized apartment is too limited to constitute a sufficient component of an owner's property rights as to be independently the subject of an economic viability deprivation. A

taking, it argues, must be measured by the impact of the restriction upon the property as a whole. The right to exclude others, however, has always been considered " 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.' " *(Hodel v Irving,* 481 US 704, 716, *supra,* quoting *Kaiser Aetna v United States,* 444 US 164, 176.) *Hodel (supra,* at 715) involved the abrogation of an owner's "right to pass on * * * property" to his heirs. In language equally pertinent here, the Court held, "Of course, the whole of appellees' decedents' property interests were not taken by [the statute]. Appellees' decedents retained full beneficial use of the property during their lifetimes as well as the right to convey it *inter vivos.* There is no question, however, that the right to pass on valuable property to one's heirs is itself a valuable right." *(Supra,* at 715.)

*Penn Cent. Transp. Co. v New York City* (438 US 104), relied upon by Lenox Hill on this point, does not support its argument that to be deemed a taking a statute must affect the economically viable use of the property as a whole. The *Penn Cent.* Court's reasoning that " '[t]aking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated" refers to distinct physical segments of a particular parcel of land, which is consistent with its conclusion that there was no taking merely by virtue of the impaired value of the air rights above Grand Central Station *(supra,* at 130). The Court was not referring to temporal interests in property, such as the reversionary interest involved here, which has, for centuries, been recognized as a discrete estate in Anglo-American law. *(See,* Powell, Real Property § 266 [1], at 19-17.) Lenox Hill's reliance on *Keystone Bituminous Coal Assn. v DeBenedictis* (480 US 470, *supra)* is misplaced for the same reason. In *Keystone,* the challenged statute regulated only some of the physical elements of the property, i.e., the surface support area. Unlike here, a discrete temporal property interest was not involved.

More to the point, with respect to the argument that an owner's reversionary interest in rental apartments is not a sufficient component of property rights to support a deprivation of "economically viable use" *(Seawall Assocs. v City of New York,* 74 NY2d, *supra,* at 107) in a regulatory takings claim, it is well settled that the three most essential elements of property ownership are the rights to " 'possess, use and dispose.' " *(Loretto v Teleprompter Manhattan CATV Corp.,* 458 US 419, 435, quoting *United States v General Motors*

*Corp.,* 323 US 373, 378; *Seawall Assocs. v City of New York, supra,* at 108.) The permanent deprivation of an owner's right to reenter and select the next tenant clearly implicates the right to possess and use.

In distinguishing this case from *Lenox Hill I (supra),* the IAS Court cited the fact that, unlike here, the reversionary interest there related to the right to dispose of condominium units, which had a measurable, quantifiable market value. This argument confuses the property right taken, as for instance, an owner's reversionary interest, with the monetary measure of the property right confiscated. The question of whether a taking has occurred is one issue; if it has, a separate inquiry is required to determine the appropriate compensation. *(See, Loretto v Teleprompter Manhattan CATV Corp.,* 458 US, *supra,* at 441.) While the value of the reversionary interest may be measured differently in the two cases, a taking nonetheless has occurred in both instances.

Lenox Hill, supported by the Attorney-General, and citing *Matter of Cale Dev. Co. v Conciliation & Appeals Bd.* (94 AD2d 229, *affd* 61 NY2d 976), *Koenig v Jewish Child Care Assn.* (107 AD2d 542, *affd* 67 NY2d 955) and *Matter of Schwartz Landes Assocs. v New York City Conciliation & Appeals Bd.* (117 AD2d 74, *supra)* argues that it is entitled to renewal leases and the protection of the Rent Stabilization Law, without regard to chapter 940, on the basis of well established precedent which protects legitimate corporate tenancies as long as the subject premises are, in fact, utilized as the primary residence of the intended occupants.

This argument begs the question. In none of these cases did the Court address the issue in terms of the "takings clause," which, in my view, is implicated whenever rent regulation provisions are interpreted so as to require the offer of renewal leases in perpetuity to a corporate tenant since such an interpretation deprives the landlord of an economically viable use of its property by abrogating the landlord's reversionary interest. Thus, quite apart from chapter 940, a regulatory taking would occur in this case. While no takings argument was made in *Cale,* which held that a corporate tenant was entitled to a renewal where the lease designated a specific individual and that individual actually used the apartment as his primary residence, the Court did observe that "rent stabilization was never intended to place [a corporate] tenant's leasehold estate in perpetual trust for the benefit of whomever, at a particular point in time, might happen to occupy a corporate office" (94 AD2d, *supra,* at 234-235).

Finally, Lenox Hill argues that the owner is estopped from challenging the constitutionality of chapter 940 because it took full advantage of the 15% supplemental rent increase provided therein to landlords who lease apartments to not-for-profit hospitals for use by their staff. In its estoppel argument Lenox Hill invokes the general rule that a party may not obtain a benefit under a statute and later challenge the statute's constitutionality. While the rule is correctly stated, its applicability is limited to those instances where a party has voluntarily subjected itself to the statute's application; it does not apply where, as here, the statute's coverage has been thrust upon the party. *Fahey v Mallonee* (332 US 245) illustrates the point. There, the plaintiffs, who had voluntarily formed a banking organization under section 5 of the Home Owners' Loan Act of 1933 (48 US Stat 128) thereafter challenged the constitutionality of section 5 (d), which authorized the Federal Home Loan Bank Board to prescribe regulations for the reorganization, consolidation, merger or liquidation of building and loan associations with the power to appoint a conservator. Rejecting the challenge, the Court noted, "It would be intolerable that the Congress should endow an Association with the right to conduct a public banking business on certain limitations and that the Court at the behest of those who took advantage from the privilege should remove the limitations intended for public protection." *(Supra,* at 256; *see also, State Div. of Human Rights v State of N. Y. Executive Dept., Div. of State Police,* 62 AD2d 617, *appeal dismissed* 46 NY2d 939; *Armour Handcrafts v Miami Decorating & Design Ctr.,* 99 AD2d 521.) The distinction here is obvious. The owner, having acquired the building in question seven years before the enactment of chapter 940, did not voluntarily elect to be subject to its provisions.

Thus, in my view, the IAS Court's interpretation of chapter 940 effects an unconstitutional taking of property without just compensation. Chapter 940 should be interpreted in a manner which brings it into harmony with the Constitution. *(People v Dietze,* 75 NY2d 47, 52.) For the reasons expressed in *Lenox Hill I* (157 AD2d, *supra,* at 151-153), I would interpret chapter 940 as requiring the owner to offer renewal leases to the Lenox Hill employees who occupied the subject apartments as their primary residences at the expiration of their most recent renewal leases. As was said in *Lenox Hill I,* "Such an interpretation results in the continued occupancy of these apartments by those persons occupying them as their primary residence for as long as they continue to do so. Since the

renewal lease is offered to persons, rather than to Lenox Hill, an institution with a virtually limitless existence, [the owner] has a reasonable expectation of a vacancy at some point. When such a vacancy occurs, it can exercise the prerogatives of ownership and determine how the property is to be used." *(Supra,* at 153.)

Accordingly, I would reverse, grant plaintiffs' motion for summary judgment on the first and second causes of action and declare in the owner's favor in accordance with the foregoing. *[See,* 154 Misc 2d 982.]