84 N.Y.2d 385 (1994)
643 N.E.2d 479
618 N.Y.S.2d 857
Amir Manocherian et al., Doing Business as Fame Company, Appellants,
v.
Lenox Hill Hospital et al., Respondents, et al., Defendants.
Court of Appeals of the State of New York.
Argued June 9, 1994.
Reargued August 30, 1994.
Decided October 20, 1994.
Rosenberg & Estis, P. C., New York City (Gary M. Rosenberg and Jeffrey Turkel of counsel), for appellants.
Proskauer Rose Goetz & Mendelsohn, New York City (Edward S. Kornreich, Steven E. Obus, Scott A. Eggers and Mark P. Monack of counsel), and Edmund F. Wolk for Lenox Hill Hospital, respondent.
G. Oliver Koppell, Attorney-General, New York City (June Duffy and Jerry Boone of counsel), in his statutory capacity under Executive Law § 71.
Ronald A. Zumbrun, James S. Burling, R. S. Radford and Alexander Dushku, of the California Bar, admitted pro hac vice, and Klein & Keenan, Yonkers (Carol S. Keenan of counsel), for Pacific Legal Foundation, amicus curiae.
Judges SIMONS, TITONE, MANGANO[*] and CREW[*] concur with Judge BELLACOSA; Judges LEVINE and CIPARICK dissent and vote to affirm in separate dissenting opinions; Chief Judge KAYE and Judge SMITH taking no part.
*388 BELLACOSA, J.
Plaintiffs, owners of several New York City rent-stabilized apartments at issue here, seek summary judgment to declare chapter 940 of the Laws of 1984 unconstitutional and related relief. That enactment requires the owners to offer renewal leases to defendant-respondent, Lenox Hill Hospital, a not-for-profit hospital enterprise on the Upper East Side of Manhattan, for apartments occupied by some of the hospital's employees. Supreme Court and the Appellate Division upheld the validity of the statute and plaintiffs appeal as of right on constitutional grounds and a two-Justice dissent.
The precise issue for us to decide is whether chapter 940 of the Laws of 1984 substantially advances a legitimate State interest, justifying the State's imposition of distinctive encumbrances and obligations on plaintiffs' private property rights. The statute purports to justify and accomplish its objective through an amendment tied to the general purposes of the Rent Stabilization Law (RSL) and Emergency Tenant Protection *389 Act (ETPA). While these twin enactments coexist to remedy a persisting emergency housing shortage, the particular statute under review perpetuates a small, privileged housing stock. In terms, actuality, and functional impact, the statute does not protect and benefit specific occupant subtenants, but rather erects a subsidized housing regime for Lenox Hill Hospital's preferential allotment.
We conclude that this legislation suffers a fatal defect by not substantially advancing a closely and legitimately connected State interest (see, Seawall Assocs. v City of New York, 74 N.Y.2d 92, 107, cert denied sub nom. Wilkerson v Seawall Assocs., 493 US 976; Rent Stabilization Assn. v Higgins, 83 N.Y.2d 156, 174, cert denied ___ US ___, 114 S Ct 2693 [June 13, 1994]; see also, Nollan v California Coastal Commn., 483 US 825). Thus, we reverse the order of the Appellate Division.

I.
This long-standing dispute cannot be understood or resolved without some historical background and context (see, 520 E. 81st St. Assocs. v Lenox Hill Hosp., 157 AD2d 138, revg 142 Misc 2d 723, revd on other grounds 77 N.Y.2d 944). The rent stabilization system began in 1969 to ameliorate, over time, the intractable housing emergency in the City of New York. The housing shortage was ascribed to "continued high demand, attributable in part to new household formation and decreasing supply" (ETPA [L 1974, ch 574, § 4] § 2; see, Local Laws, 1969, No. 16 of City of New York § 1, now codified as Administrative Code of City of NY § 26-501). By regulating rents and providing occupants with statutory rights to tenancy renewals under rent stabilization  a "less onerous form of [rent] regulation"  the State intended to protect dwellers who could not compete in an overheated rental market, through no fault of their own (Sullivan v Brevard Assocs., 66 N.Y.2d 489, 494; see, Braschi v Stahl Assocs. Co., 74 N.Y.2d 201, 214 [concurring opn]). The regulation of this field has been maintained "to prevent uncertainty, hardship and dislocation," and to "forestall profiteering, speculation and other disruptive practices" (see, e.g., Administrative Code § Y51-1.0 [renum § 26-401]).
Unlike rent control, which places stricter price controls on owners and leaves many dwellings only marginally profitable, the State, in enacting rent stabilization, seeks to insure more balanced terms under which owners may apply for regulated *390 rent increases and to protect primary occupants. Thus, in 1971, the Legislature exempted from rent stabilization regulation all housing accommodations not "occupied by the tenant in possession as his [or her] primary residence" (L 1971, ch 373). Similar language was incorporated into section 5 (a) (11) of the ETPA of 1974 (see, L 1974, ch 576, § 4). The phrase "tenant in possession" included both the tenant of record and any subtenant residing in the regulated apartment. In 1983, however, the Omnibus Housing Act (OHA) amended Rent Stabilization Law § YY51-3.0 (a) (1) (f) (now § 26-504 [a] [1] [f]) to exempt from the RSL dwelling units "not occupied by the tenant, not including subtenants or occupants, as his [or her] primary residence" (L 1983, ch 403, § 41 [emphasis added]). Thus, under OHA, the named leaseholder had to occupy the apartment as a primary residence in order to qualify for a renewal lease. While the subletting of apartments was still permitted, Administrative Code § YY51-6.0 (c) (14) (now § 26-511 [c] [12]) added that such tenants could not sublet units for more than a total of two years out of a four-year period, and only on the establishment of primary residency.
Next came chapter 940 of the Laws of 1984 (L 1984, ch 940, codified at Administrative Code of City of NY § YY51-3.0 [renum § 26-504]). It was enacted 13 months after the passage of chapter 403 and exclusively exalts the renewal rights of not-for-profit hospitals, which had formerly subleased rent-stabilized apartments to qualified hospital employees. Section 1 of chapter 940 amended the nonprimary RSL § YY51-3.0 (a) (1) (f) (renum § 26-504 [a] [1] [f]), providing "[w]here a housing accommodation is rented to a not-for-profit hospital for residential use, affiliated subtenants authorized to use such accommodations by such hospital shall be deemed to be tenants." Thus, under chapter 940, subtenants of the primary tenant, a nonoccupying, not-for-profit hospital, were deemed qualified tenants in specific contradiction of the general purport of the 1983 OHA reforms. Chapter 940 further grants not-for-profit hospitals the right to sublet apartments to affiliated employees without first obtaining an owner's consent and without requiring the hospital itself to maintain these apartments as a primary residence. Indeed, unlike any other regulated tenants, all of whom are authorized to sublet for only two out of every four years, the sublets by the not-for-profit hospital to its selected and variable employees is durationally unrestricted and open-ended. This is a unique and additional preference accorded no one else similarly situated. Moreover, *391 the hospital's special privileges last for as long as its unilaterally controlled corporate existence.
The legislative history of chapter 940 reveals that Lenox Hill Hospital was the principal agent in urging the amendment (see, Senate Debates, NY Senate Bill S 9983, June 28, 1984 ["(t)his bill has been introduced at the request of Lenox Hill Hospital in New York City * * * (and i)ts purpose is to enable Lenox Hill to have the right to renewal leases"]). The salutary motivation was the preservation of safe, convenient, affordable housing for hospital staff (see, Letter from Lenox Hill Hospital, dated July 27, 1984, Bill Jacket, L 1984, ch 940, at 29). The primary and real beneficiary of this legislation, however, is Lenox Hill Hospital, not actual dwellers. The latter are only incidentally benefitted and may be evicted under the exclusive control or at the whim of their employer, Lenox Hill Hospital, to which the Legislature transferred significant, distinctive, apartment ownership prerogatives without its having to endure the burdens and costs of ownership.
The affected apartment owners sued, believing that chapter 940 could not constitutionally mandate that they provide Lenox Hill Hospital with these benefits under perpetual renewal leases. Supreme Court, in the phase of the litigation with which we are now dealing, dismissed the complaint. It held that chapter 940 did not constitute a physical taking since the owners had previously and voluntarily opened their premises to the hospital's prime tenancy. Supreme Court also found no regulatory taking and concluded that chapter 940 advanced the principal goal of the RSL (154 Misc 2d 982). The Appellate Division (196 AD2d 728), with two Justices dissenting, affirmed for the reasons stated by Supreme Court.

II.
Elementary and strong constitutional principles protect private property rights and govern takings of property for public use without just compensation. They evolved "`to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole'" (Penn Cent. Transp. Co. v New York City, 438 US 104, 123, quoting Armstrong v United States, 364 US 40, 49; Seawall Assocs. v City of New York, 74 N.Y.2d 92, 101, cert denied sub nom. Wilkerson v Seawall Assocs., 493 US 976, supra).
*392 While there is no "precise mathematical calculation" for determining when an adjustment of rights has reached the point when "`fairness and justice'" requires that compensation be paid (Dolan v City of Tigard, 512 US ___, ___, ___, 114 S Ct 2309, 2316, 2319 [June 24, 1994]), in Seawall Assocs. v City of New York (supra), this Court implemented the doubled-edged test for determining whether a regulatory taking has occurred. We held that a "burden-shifting regulation" will constitute a taking "(1) if it denies an owner economically viable use of his [or her] property, or (2) if it does not substantially advance legitimate State interests" (id., at 107, citing Nollan v California Coastal Commn., 483 US 825, 834, supra; see also, Agins v Tiburon, 447 US 255, 260). Failure to measure up to either criterion can invalidate a governmental incursion or encumbrance on private property rights (see, Seawall Assocs. v City of New York, supra; Lucas v South Carolina Coastal Council, 505 US ___, ___, 112 S Ct 2886, 2894; Nollan v California Coastal Commn., supra; Keystone Bituminous Coal Assn. v DeBenedictis, 480 US 470, 485, 495; Armstrong v United States, 364 US 40, supra). We are governed by this framework and discern no analytical basis or precedential authority to drop below this floor of constitutional protection for property owners or to alter well-established substantive and procedural rubrics and guidance in this complex field. In particular, we are satisfied that even if the economic impact aspect of this test (see, Hodel v Irving, 481 US 704, 714) were not to be satisfied, that feature alone could not defeat the owners' interests and claims in a controversy such as this, without consideration and fulfillment of the substantial State interest and close causal nexus prong of the governing test, even as to regulatory takings.
This Court also recently expressed the view that the substantial State purpose for such legislation must be bound by a "close causal nexus" to survive scrutiny (see, Rent Stabilization Assn. v Higgins, 83 N.Y.2d 156, 174, cert denied ___ US ___, 114 S Ct 2693 [June 13, 1994], supra; see also, Dolan v City of Tigard, 512 US ___, 114 S Ct 2309, supra). The precedents, State and Federal, thus establish a constitutional minimum floor of protection which this Court lacks authority to diminish under the Supremacy Clause (see, Kaye, Dual Constitutionalism in Practice and Principle, February 1987 Cardozo Lecture, reprinted in 42 Record of Assn of Bar of City of NY 285, 289, 293, 294; see also, Brennan, The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights, *393 61 NYU L Rev 535, 550 [1986] [the Federal Bill of Rights creates "a federal floor of protection"]).
While the typical taking occurs when the government acts to physically intrude upon private property, governmental regulations which limit owners' rights to possess, use or dispose of property may also amount to a "taking" of the affected property (see, e.g., Agins v Tiburon, 447 US 255, supra; Nectow v Cambridge, 277 US 183, 188; Seawall Assocs. v City of New York, 74 N.Y.2d 92, 101, cert denied sub nom. Wilkerson v Seawall Assocs., 493 US 976, supra). We held in Seawall that the challenged local law effected a regulatory taking and was unconstitutional because the burdens imposed on owners did not substantially advance the stated public aim of alleviating homelessness. The combined effect on the instant case of these principles gains inexorable momentum from the twin temples of the Supremacy Clause flowing from pertinent United States Supreme Court precedents and the stare decisis import of our own decisions.
The differing views of the members of the Court in this case derive principally from varying interpretations of governing precedents. As to Judge Ciparick's dissenting opinion, the difference is essentially one of application, but as to Judge Levine's, it is a profound difference from the majority as to the understanding and interpretation of what the many governing precedents say and mean. Judge Levine's dissent discounts Seawall and casts unfortunate uncertainty on the governing precedents and principles, while the majority is more confident as to the meaning and application of the governing law (compare, Simpson v Loehmann, 21 N.Y.2d 305, 314 [Breitel, J., concurring opn]).
For example, there is no basis in Nollan itself for concluding that the Supreme Court decided to apply different takings tests, dependent on whether the takings were purely regulatory or physical. The Court promulgated a principle for all property and land-use regulation matters. A crucial threshold of analysis is that no taking occurs if a law "`substantially advance[s] legitimate state interests'" (Nollan, supra, at 834). In discussing the lack of a standard for determining what constitutes a "legitimate state interest," the Supreme Court specifically referred to nonphysical regulatory takings cases (see, Nollan, supra, citing Agins v Tiburon, 447 US 255, supra; and Penn Cent. Transp. Co. v New York City, 438 US 104, supra). Further, the Supreme Court refrained from placing *394 any limitations or distinctions or classifications on the application of the "essential nexus" test. This suggests and supports a uniform, clear and reasonably definitive standard of review in takings cases (see generally, Peterson, Land Use Regulatory "Takings" Revisited: The New Supreme Court Approaches, 39 Hastings LJ 335, 351). Indeed, Justice Brennan, in dissent in Nollan, expressly attributed to the majority's holding in Nollan an impact on all regulatory takings cases, stating that the Court's "exactitude * * * is inconsistent with our standard for reviewing the rationality of a State's exercise of its police power for the welfare of its citizens" (Nollan, supra, at 842-843).
We conclude that chapter 940 fails the test of substantially advancing a legitimate State interest warranting the indeterminate and unjustifiable burden draped disproportionately on the particular owners' shoulders. That law, in the unusual development and circumstances of this case, must meet the constitutional safeguards on its own merits, not as an augmentation or complement to some generalized State interest found elsewhere in organic law or other statutes. Indeed, in significant respects, the particular statute contradicts two key goals of the RSL, to wit, occupant protection and eventual market redemption. These incongruities flow out of the transferral of power from a landlord to the employer of the actual occupants, and by the removal of the affected apartments entirely and permanently from marketplace availability or potentiality for other publicly interested or vying occupants at rent-stabilized rates.
The preservation of this Manhattan Upper East Side housing enclave for this privileged entity's benefit, albeit one engaged in a laudable and necessary eleemosynary health service function, cannot masquerade as general welfare legislation. Purporting to promote the general public welfare by enabling not-for-profit hospitals to continue to provide subsidized housing benefits to its chosen employees cannot sustain the sweep and manner of the burden and confiscation effected against the few owners. Dissenting Justice Joseph P. Sullivan aptly framed the consequences as follows:
"A statutory interpretation which encourages the deployment of rent stabilized apartments in perpetuity as temporary dormitory space for an ever changing roster of hospital employees and promotes the displacement of these employees, some *395 of whom may be long-term tenants, when they leave their employment does a disservice to rent stabilization's underlying purpose of protecting residential tenants from evictions during an acute housing shortage" (196 AD2d 728, 732, supra).
Lenox Hill Hospital, the State and our colleagues, Judges Levine and Ciparick, in their discrete dissenting opinions, urge that the requisite State interest is satisfied under the over-all umbrella of the RSL and for the general health and welfare. We respectfully disagree. Judge Ciparick's dissenting opinion, in our view, does not give the holdings of the governing cases sufficient weight and import affecting the rationale and application we have advanced in the instant case. Judge Levine's approach, on the other hand, would seem to undermine Seawall or, sub silentio, place its precedential force in considerable doubt. Functionally, his analysis undercuts the legitimate State interest and close causal connection components of the well-established test. Moreover, the majority has not, as Judge Levine asserts, adopted some variable of the standard governing tests or effected per se rules, applications or consequences (Levine, J., dissenting opn, at 407).
The Supreme Court and this Court in the cited cases have ruled definitively in the fulfillment and exercise of an appropriate and necessary judicial review function, providing governing guidance for future cases, including this one. This traditional, fundamental, judicial role is not inimical to the prerogatives of the other branches, but serves instead as the singular check and balance against governmental intrusion and overreaching (Ciparick, J., dissenting opn, at 420). We, thus, resolve the controversy between the property owners and their prime tenant, Lenox Hill Hospital, and thus settle the juridical relationship and rights as between them. The power equation should, therefore, not be characterized as between so-called greedy owners and needy dwellers. Rather, this case is about a one-dimensional financial award, subsidizing an employer which happens to be a nonoccupying prime tenant and which wishes to avoid the concomitant burdens and responsibilities of ownership. Whatever consequences flow from our ruling, then, are the product of the law itself and its proper adjudication, not a societal or policy preference of our making.
The central, underlying purpose of the RSL is to ameliorate the dislocations and risk of widespread lack of suitable dwellings. *396 Chapter 940 does not contribute to that desirable altruistic aim. It affects a tiny number of dwelling units. The effect of the statute is also quite ephemeral. These apartments were subject to rent stabilization prior to the enactment and will remain so, irrespective of the outcome of this long-standing dispute affecting a dwindling number of apartments, still in controversy in this litigation, with respect to the hospital's prime tenancy lease renewal entitlements. Accordingly, chapter 940 fails to substantially or functionally prevent or relate to excessive rents and profiteering.
The realistic appraisal of chapter 940 shows that it was sought and designed essentially to subsidize the nonprofit hospital's special fringe benefit to some of its special health care employees. This common employer-employee dilemma has no legally or legitimately cognizable, causal relationship to the governmental intrusion on rights and entitlements due owners in the use and enjoyment of their properties in a rental market where demand intractably exceeds supply at affordable levels. Chapter 940 is really interposed as a special housing program, privately funded through those owners who happen to have previously rented to not-for-profit hospitals, like Lenox Hill Hospital.
The real goal of Lenox Hill and other arguably similarly situated not-for-profit hospitals is preserving a valuable perk for some of its health care workers. This has little to do with a general State housing concern warranting chapter 940's intervention. Rather, it sharply contradicts that indispensable legislative threshold and constitutional prerequisite. The fact that the State has acted through the "landlord-tenant relationship does not magically transform general public welfare, which must be supported by all the public, into mere `economic regulation,' which can disproportionally burden particular individuals" (Pennell v San Jose, 485 US 1, 22; see also, Penn Cent. Transp. Co. v New York City, 438 US 104, 124, supra).

III.
The exception created by this challenged enactment to the primary, occupying tenancy entitlement is infirm for additional reasons. A proffered State interest, which by definition should serve and protect the general populace on a fairly and uniformly applied basis, should not be countenanced when, as occurs here, the statute instead benefits one special class for *397 an essentially unrelated economic redistribution and societal relationship (see, 19th St. Assocs. v State of New York, 79 N.Y.2d 434). Moreover, the employer here is transformed into the de facto landlord and receives a benefit directly related to conserving its capital or operating expenditures. As a health care provider, it would otherwise have to recoup those costs by direct expense reimbursement formulas or charges, like others similarly situated, for the true, full cost of medical services rendered in its community. This statute thus diverts and subverts that equal treatment regime. It does not even really protect housing for the subtenant-employees as such, and certainly provides no benefit to the citizenry at large on a fair opportunity and equal access basis. Rather, it bestows a State-enacted indirect gift to a preferred supplicant, the nonoccupying prime tenant, underwritten by the improperly burdened property owners. In this respect, chapter 940 cannot escape the force of 19th St. Assocs. v State of New York (79 N.Y.2d 434, supra), a potent precedent like several others (see, e.g., Seawall, Higgins, Nollan, Agins), not fully appreciated as to their full import and impact in both dissenting expressions.
Part of the underpinning of the hospital's and State's claim in this case rests on a belated assertion of a health care crisis in the City of New York. The Legislature declared no such crisis in enacting this privileged exception. Also, such a generalization would precedentially countenance a myriad of favoritism experiments or supplicant demands or preferential entitlements to special classes of entities over the wider, appropriate and constitutionally authorized and recognized State interests of the general public.
We conclude that the peripheral and generalized State interests offered as justification for the regulatory mandates of chapter 940 fail to sustain the legislation, as constitutionally required for such State action. They are not closely or legitimately connected to the long-established and recognized goals of the RSL and ETPA, which seek to ameliorate the emergency housing shortage. The regime of this statute, in significant functional respects, contradicts an essential tenet of housing protection, at the root of rent-controlled and rentstabilized enactments. An overarching goal of the RSL and ETPA is to afford some measure of security to occupants so they do not lose their scarce dwelling space due to unilateral, oppressive activities from more powerful entities in the societal equation, whether they be landlords or employers or both. The insupportable contradiction in this statute is cogently *398 demonstrated by its unabashed transfer to the corporate employer of greater eviction rights over its affiliated and disaffiliated employee subtenants than the owner is allowed to retain.

IV.
Appellants owners also claim that chapter 940 results in a regulatory wresting away of their reversionary property interests. Property attributes to any physical object include the rights "to possess, use and dispose" of the asset (United States v General Motors Corp., 323 US 373, 378). It is well established that even if only a single element of an owner's "`bundle of [property] rights'" is extinguished, there has been a regulatory taking (see, Hodel v Irving, 481 US 704, 716, supra; see also, Seawall Assocs. v City of New York, 74 N.Y.2d 92, supra). Application of the Seawall analysis in that respect to the present case adds further support to our primary analysis and result that an unconstitutional taking occurs here under chapter 940 (see, Hodel v Irving, 481 US 704, supra; Koenig v Jewish Child Care Assn., 67 N.Y.2d 955; Rent Stabilization Assn. v Higgins, 83 N.Y.2d 156, 176, supra)  though we need not decide this issue on a stand-alone basis because we do not consider it dispositive by itself in this case. We respectfully submit that Judge Levine's dissenting opinion also misperceives and mischaracterizes the majority's analysis and holding in the reversionary interest aspect of this case.
Because Lenox Hill Hospital has enjoyed a corporate existence since 1917, the enactment also confers a tenancy quite different in kind, degree and potential from the human, personal successorships countenanced in Braschi v Stahl Assocs. Co. (74 N.Y.2d 201, 214, supra) and Rent Stabilization Assn. v Higgins (83 N.Y.2d 156, supra; cf., Sullivan v Brevard Assocs., 66 N.Y.2d 489, supra). These cited successorships were narrowly recognized and permitted precisely because of the analytic-policy underpinning of averting personal evictions of real people. They are consistent with the antieviction goals of the ETPA and RSL. This statute is not. Yet, both dissents ignore the critical distinction.
We next turn to Yee v Escondido (503 US 519), which does not compel a different result, despite Judge Levine's extensive reliance. Yee was a "physical occupation" takings case, not a regulatory type. More importantly, Yee dealt with an entirely different statutory scheme. In Yee, a group of mobile *399 home park owners brought an action claiming that a local rent control ordinance, which applied to all mobile home parks in the municipality, constituted a physical taking because the local ordinance deprived the petitioners of all use and occupancy of their real property. Yee is additionally distinguishable because the local law was general, not a targeted, narrow, special interest as with chapter 940, and there was no allegation or proof submitted by the park owners that the local ordinance placed an inordinate burden on selected individuals which, "`in all fairness and justice, should be borne by the public as a whole'" (Penn Cent. Transp. Co. v New York City, 438 US 104, 123, supra). Moreover, although the Supreme Court refused to address the petitioners' regulatory taking claim, citing a Supreme Court rule 14.1 (a) violation, the Court stated that the regulatory claim did "not depend on the extent to which petitioners are deprived of the economic use of their particular pieces of property" (Yee v Escondido, 503 US, at 534, supra). Thus, Yee is more analogous to a constitutional challenge against the legislatively created rent control and rent stabilization as a whole, which we certainly do not have in this case and by no means does our ruling affect or diminish the general validity of those broad, long-standing protections and enactments.
Lenox Hill Hospital also urges that chapter 940 assures an "economically viable rate of return" on the subject apartments to owners, since the statute provides for a 15% vacancy surcharge if there has been no vacancy rental increase within the prior seven years. The sweep of chapter 940, however, goes well beyond that tendered balance wheel (compare, Concrete Pipe & Prods. v Construction Laborers Pension Trust, 508 US ___, ___, 113 S Ct 2264, 2291). The statute vests renewal rights in an entity of unlimited existence, a notion directly contrary to another goal of the RSL and ETPA  to free up apartments, fairly and appropriately, as soon as practicable (see, Rent Stabilization Assn. v Higgins, 83 N.Y.2d 156, 176-177, supra; Koenig v Jewish Child Care Assn., 67 N.Y.2d 955, 958, supra). Lastly in this connection, the Court appears to be unanimous in rejecting Lenox Hill's assertion that plaintiffs are estopped from contesting the constitutionality of chapter 940.
The sharply focused legal question under the controlling precedential and analytical principles may be reduced simply to whether the legislation is supported by a substantial State interest and close nexus. No amount of extensive and virtually *400 exclusive exploration of economic recalibration of the test, as an expectation for the future, can change that central controlling feature under reasonably clear precedents and principles. To take State action as with the challenged statute, the State must show a legitimate, substantial State interest that is closely, causally related to the action undertaken. The Constitution forbids State action by fiat, no matter the economic equation. Thus, by exercising the judiciary's constitutional duty to decide this case within appropriate precedential and judicial review templates, this Court concludes that the generalized presumption of constitutionality accorded to statutes cannot substitute for the fundamental defect in chapter 940, to wit, no substantial advancement of a legitimate State interest and "close causal nexus" required for the challenged regulatory enactment to survive scrutiny (see, Rent Stabilization Assn. v Higgins, 83 N.Y.2d 156, 173-174, supra).
Accordingly, the order of the Appellate Division should be reversed, with costs, and chapter 940 of the Laws of 1984 declared unconstitutional and the case should be remitted to Supreme Court, New York County, for such further proceedings as may be necessary and appropriate to resolve rights and remedies among the parties to this litigation affected by the holding of this case.
LEVINE, J. (dissenting).
I respectfully dissent.
In my view, the majority has mistakenly applied a per se standard to an as-applied, purely regulatory takings claim under the Just Compensation Clause of the Fifth Amendment here. In doing so, the majority disregards plaintiffs' utter failure to show that they suffered any economic loss to their investment in the New York City residential rentals market as a result of the application of chapter 940 of the Laws of 1984 to their 100-plus units apartment building. This case presents essentially and realistically a takings claim challenge to an economic regulation of a business enterprise and, as such, economic analysis of the impact of the regulation is particularly vital to achieving a just disposition of the case. Chapter 940, which merely restored to New York City nonprofit community hospitals the protection of the Rent Stabilization Law of 1969 (RSL) and the Emergency Tenant Protection Act of 1974 (ETPA) they previously enjoyed, is completely consistent with and directly furthers basic purposes of the RSL and the ETPA and this Court should sustain its validity.

*401 I.
Concededly and indeed as characterized by plaintiffs, the instant action is a challenge under the Just Compensation, or "Takings" Clause of the Fifth Amendment of the United States Constitution to chapter 940 of the Laws of 1984 as applied to their ownership of an apartment building of over 100 units on the Upper East Side of Manhattan, 15 of which are leased to defendant Lenox Hill Hospital. Also, before this Court, plaintiffs have abandoned any claim that the tenant eviction protection restored to Lenox Hill under chapter 940 constitutes a per se, physical taking, that is, statutory authorization for a physical occupation of their property (cf., Loretto v Teleprompter Manhattan CATV Corp., 458 US 419, 426; Seawall Assocs. v City of New York, 74 N.Y.2d 92, 102-106). Accordingly, this appeal is limited to an as-applied challenge to an alleged, purely regulatory taking.
In Penn Cent. Transp. Co. v New York City (438 US 104), the Supreme Court articulated the appropriate considerations and method of analysis by courts in reviewing such purely regulatory, as-applied taking challenges. First, the Court emphasized that the Just Compensation Clause, insofar as it extends to a regulatory taking, deals with disproportionate economic burdens unfairly imposed on a comparatively few individuals by government regulation, and that there is no simple litmus test to determine whether a given regulation constitutes a taking. "[T]his Court, quite simply, has been unable to develop any `set formula' for determining when `justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons" (id., at 124 [emphasis supplied]). The Court in Penn Cent. cautioned "that government may execute laws or programs that adversely affect recognized economic values" without giving rise to a valid takings claim and that there are other instances where, although "government action caused economic harm, it did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute `property' for Fifth Amendment purposes" (id., at 124-125 [emphasis supplied]).
Thus, the Court in Penn Cent. directed that judicial review of a claimed as-applied regulatory taking entails "ad hoc, factual inquiries" in which notably important factors to be considered are "[t]he economic impact of the regulation on the *402 claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations" (id., at 124).
The Supreme Court in Penn Cent. also rejected a Takings Clause methodology later described as "conceptual severance",[1] i.e., the stratagem of dividing a unitary property into its various component physical segments or its various integral property interests and finding a taking because of the challenged regulation's impact on one physical segment or an individual property right. "`Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole" (id., at 130-131 [emphasis supplied]).
Supreme Court decisions subsequent to Penn Cent., including decisions authored by the Justices most sensitive to the property rights of owners in Takings Clause cases, confirm the continued validity of the Penn Cent. ad hoc analysis in as-applied regulatory taking cases, with its emphasis on identifying the economic factors involved in the taking. Thus, in Hodel v Irving (481 US 704), Justice O'Connor characterized the Penn Cent. approach as a "framework for examining the question whether a regulation of property amounts to a taking requiring just compensation [which] is firmly established and has been regularly and recently reaffirmed" (id., at 713-714). Chief Justice Rehnquist in Pennell v San Jose (485 US 1), declined to entertain a facial regulatory taking challenge to a rent-control ordinance because it was impossible to ascertain the economic impact of the ordinance at that preliminary stage. "Given the `essentially ad hoc, factual inquir[y]' involved in the takings analysis * * * the mere fact that a hearing officer is enjoined to consider hardship to the tenant in fixing a landlord's rent, without any showing in a particular case as to the consequences of that injunction in the ultimate determination of the rent, does not present a sufficiently concrete factual setting for the adjudication of the takings claim appellants raise here" (id., at 10 [emphasis supplied]). And in Lucas v South Carolina Coastal Council (505 US ___, 112 S Ct 2886), *403 Justice Scalia again affirmed that in the absence of a per se taking "we have acknowledged time and again, `[t]he economic impact of the regulation on the claimant and . . . the extent to which the regulation has interfered with distinct investment-backed expectations' are keenly relevant to takings analysis generally" (505 US, at ___, n 8, 112 S Ct, at 2895, n 8, supra).
The Supreme Court's emphasis on inquiring for economic loss in an as-applied regulatory takings claim follows directly from the very language of the Takings Clause itself in the Fifth Amendment, which authorizes all forms of governmental appropriation of private property for a public use, upon the payment of "just compensation" (US Const Fifth Amend). As one scholar has pointed out, the "normative component" of the Takings Clause that "has predominated in modern cases" is the "protection of economic value"[2] (Manheim, Tenant Eviction Protection and the Takings Clause, 1989 Wis L Rev 925, 958). This is why "[i]t is the owner's loss, not the taker's gain, which is the measure of the value of the property taken" (United States v Causby, 328 US 256, 261; see also, Keystone Bituminous Coal Assn. v DeBenedictis, 480 US 470, 516 [Rehnquist, Ch. J., dissenting] ["the question (whether a regulatory taking has occurred) is evaluated from the perspective of the property holder's loss rather than the government's gain"]).
The centrality of determining the extent of economic loss in a regulatory takings challenge was again stressed in Keystone Bituminous Coal Assn., which held "our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property" (supra, at 497). And in Keystone, the Court also insisted that the comparison is to be based upon the economic loss to the property as a whole (id.; accord, Concrete Pipe & Prods. v Construction Laborers Pension Trust, 508 US ___, ___, 113 S Ct 2264, 2290).
It follows from the foregoing that plaintiffs' minimum burden in order to establish an as-applied regulatory taking here was to show with a modicum of definiteness that they sustained some significant loss of value in their apartment building *404 as a whole because of the application of chapter 940. Indeed, our own precedents require a Takings Clause challenger to show with a high degree of definiteness the loss of value to the affected property caused by a regulatory taking (see, de St. Aubin v Flacke, 68 N.Y.2d 66, 76-77).
In the instant case, the sole evidence submitted by plaintiffs of any adverse economic impact of chapter 940 on the value of their apartment building was the averment of one of the plaintiffs that the statutorily required renewals of the Lenox Hill leases prevented plaintiffs from exercising their vacancy rights under the RSL and ETPA, to "renovate and reconfigure the apartments to increase the fair market value and rent roll of the building". It was not inadvertent that the only economic evidence of plaintiffs was this vague reference to the possibility of increasing rents and market value of the building through renovations. They concede that if Lenox Hill and its subtenants are evicted, the apartments will remain fully subject to rent stabilization, and any new tenants and their successor family members would enjoy the full protections of the RSL and ETPA for the indefinite future. Moreover, whatever loss in the fair market value of the building caused by plaintiffs' inability to increase rents through renovations of the 15 apartments leased to Lenox Hill would be offset by the increase in market value attributable to the periodic 15% increases in Lenox Hill's rents guaranteed under chapter 940.
The other major economic factor mandated for consideration in an as-applied regulatory taking challenge is "the extent to which the regulation has interfered with distinct investment-backed expectations" (Penn Cent. Transp. Co. v New York City, 438 US 104, 124, supra; see also, e.g., Concrete Pipe & Prods. v Construction Laborers Pension Trust, 508 US ___, ___, 113 S Ct 2264, 2291, supra; Lucas v South Carolina Coastal Council, 505 US ___, ___, n 8, 112 S Ct 2886, 2895, n 8, supra; Keystone Bituminous Coal Assn. v DeBenedictis, 480 US 470, 493-495, supra). Plaintiffs purchased this apartment building in 1976, some 12 years after Lenox Hill first acquired leases in the building and seven years after the apartments became subject to rent stabilization. Uncontestably, chapter 940 did not create any greater encumbrances upon the apartments leased to Lenox Hill than existed in 1976 when plaintiffs chose to invest in the New York City residential rentals market by acquiring the property. Thus, plaintiffs have totally failed to sustain their burden of establishing that chapter 940 interfered with their investment-backed expectations (see, Concrete Pipe & Prods. v Construction Laborers Pension Trust, *405 508 US, at ___, 113 S Ct, at 2291-2292, supra).
Plaintiffs' failure to show an economic loss as the result of the application of chapter 940 should be fatal to their challenge. In Goldblatt v Hempstead (369 US 590) the Supreme Court rejected a regulatory taking challenge because "there is no evidence in the present record which even remotely suggests that [enforcement of the regulation] will reduce the value of the lot in question" (id., at 594; see also, Prune Yard Shopping Ctr. v Robins, 447 US 74, 84 [Rehnquist, J.] ["(H)ere appellants have failed to demonstrate that the `right to exclude others' is so essential to the use or economic value of their property that the state-authorized limitation of it amounted to a `taking'"]).

II.
The majority justifies its disregard of plaintiffs' failure to demonstrate any economic loss as a result of the application of chapter 940 to their apartment building primarily on two grounds. One of those grounds is that, because Lenox Hill is a corporation with "unlimited existence", chapter 940 permanently deprives plaintiffs of their reversionary interests, and this apparently is viewed as a per se taking. "[E]ven if only a single element of an owner's `bundle of [property] rights' is extinguished, there has been a regulatory taking" (majority opn, at 398). The pertinent Supreme Court decisions hold to the contrary. Plaintiffs voluntarily chose to enter the heavily regulated New York City residential rentals market when they purchased the building in 1976, and they admit that if the Lenox Hill leases are permitted finally to expire, the apartments in question will remain indefinitely in that market. Moreover, despite the application of chapter 940, plaintiffs still continue to be entitled to regain occupancy of any of the apartments from Lenox Hill by establishing that the apartment is intended for use as a primary residence of an owner or the owner's immediate family (see, 9 NYCRR 2524.4 [a]), or that the owners intend to withdraw the apartment from the rental market (9 NYCRR 2524.5 [a] [1]). Additionally, plaintiffs can terminate any of the Lenox Hill leases and recover possession by showing that Lenox Hill or its subtenants committed any of the statutorily described wrongful acts authorizing an owner to evict (see, 9 NYCRR 2524.3).
The foregoing establishes the virtually identical impairment *406 of reversionary property rights here to that considered by the Supreme Court in Yee v Escondido, (503 US 519). In Yee, the combined State and local mobile home park rent control and tenant eviction control laws imposed municipal regulation of rent increases, limited the park owner's right to terminate a mobile homeowner's tenancy to instances of nonpayment of rent and tenant misconduct, or the park owner's intention to use the park site for an entirely different purpose (see, 503 US, at 524-525, supra). Moreover, the regulations in Yee barred a park owner from disapproving a transfer of ownership of any mobile home in the park or requiring the removal of a mobile home upon its sale. Just as contended here, the taking challengers in Yee asserted that under the legislative scheme "the mobile home owner is effectively a perpetual tenant of the park, and the increase in the mobile home's value thus represents the right to occupy a pad at below-market rent indefinitely" (503 US, at 527, supra [emphasis supplied]). Not only did the Supreme Court in Yee reject the claimants' contention that the "perpetual tenancy" constituted a per se physical taking, it also ruled that the challenge to the regulation there fell within the class of cases where determining whether a taking had occurred "entails complex factual assessments of the purposes and economic effects of government actions" (503 US, at 523, supra [emphasis supplied]).
Attaching such critical significance on the takings question to the claimed permanent suspension of plaintiffs' reversionary rights also is inconsistent with the Supreme Court's rejection of the "conceptual severance" approach to challenges in Penn Cent. Transp. Co. v New York City (438 US 104, supra) and Keystone Bituminous Coal Assn. v DeBenedictis (480 US 470, supra). As stated in Andrus v Allard (444 US 51): "[W]here an owner possesses a full `bundle' of property rights, the destruction of one `strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety" (id., at 65-66 [emphasis supplied]).
Elevating the reversionary, noneconomic dominion interest of plaintiffs here to the status of a fundamental constitutional right on the regulatory takings question is, in my view, particularly inappropriate and unrealistic in the case of New York City real estate entrepreneurs in the residential rentals market, in which individual tenants and individual apartments are both highly fungible. In the New York City housing industry, an owner's genuine reversionary interest is satisfied *407 by the ability to remove a financially or behaviorally irresponsible tenant  rights plaintiffs will continue to enjoy notwithstanding the application of chapter 940.
Scholars and commentators on the Takings Clause have repeatedly pointed out that dominion property interests, that is, the right to exclude others or recover possession, may be of significance to an individual homeowner or even perhaps the lessor of a modest multifamily dwelling, but not for the modern urban real estate entrepreneur's leasing of a large apartment building where the values at stake in the landlord's reversionary rights are almost completely economic. Thus, Professor Costonis contrasted the dominion interests identified in William Pitt's famous illustration of English private property rights, that the most impoverished subject's weather-beaten cottage remained impregnable to all the King's forces, with the actual dominion interest of landlords such as plaintiffs.
"But the values comprehended by the dominion interest of Pitt's `poorest man' in his `ruined tenement' would seem to be worlds apart from those involved in the dominion interest of a Manhattan landlord, whose apartments are rented for profit to the general public and, when rented, are the subject of their tenants' exclusive possession." (Costonis, Presumptive and Per Se Takings: A Decisional Model for the Taking Issue, 58 NYU L Rev 465, 519 [1983]; see also, Manheim, Tenant Eviction Protection and the Takings Clause, 1989 Wis L Rev 925, 1010-1012; Radin, The Liberal Conception of Property: Cross Currents in the Jurisprudence of Takings, 88 Colum L Rev 1667, 1693-1695; Note, The Constitutionality of Rent Control Restrictions on Property Owners' Dominion Interests, 100 Harv L Rev 1067, 1081-1084 [1987].)
The majority's principal reason for finding a per se taking here is its conclusion that chapter 940 fails to substantially advance any legitimate State interest because the legislation was enacted purely to serve the private interests of Lenox Hill. The majority also applies a heightened level of judicial scrutiny to the issue of whether chapter 940 advances a legitimate State interest, i.e., requiring a close causal nexus between the legislative means and ends. The majority states that chapter 940 "was sought and designed essentially to *408 subsidize the nonprofit hospital's special fringe benefit to some of its special health care employees" (majority opn, at 396) and that chapter 940 cannot be characterized as general welfare legislation because it merely serves as a "preservation of this Manhattan Upper East Side housing enclave for this privileged entity's benefit" (majority opn, at 394). The absence of a close causal nexus is explained as follows: "The central, underlying purpose of the RSL is to ameliorate the dislocations and risk of widespread lack of suitable dwellings. Chapter 940 does not contribute to that desirable altruistic aim." (Majority opn, at 395-396 [emphasis supplied].)
Even under the heightened judicial scrutiny standard applied by the majority, a court is not permitted to pick and choose among the express purposes of legislation in employing the test of whether the requisite connection exists between the particular regulation and the problems the Legislature sought to ameliorate. Nor does strict scrutiny require that a regulation serve all of the legitimate State interests the Legislature sought to advance by the statutory scheme.
Undeniably, at least one of the original primary purposes of the rent stabilization laws was "to prevent speculative, unwarranted and abnormal increases in rents" and "to forestall [landlord] profiteering, speculation and other disruptive practices" (Findings and Declaration of Emergency, Local Laws, 1969, No. 16 of City of New York, now codified at Administrative Code of City of NY § 26-501). The tenant eviction protection provisions of the RSL and ETPA not only have the purpose of ameliorating harmful dislocations of tenants (as alluded to in the majority's opinion), but also serve as a necessary element of any effective rent-regulation program. As recognized by Justice Holmes in Block v Hirsh (256 US 135), the first Supreme Court Takings Clause review of rent control and tenant eviction protection legislation: "The preference given to the tenant in possession is an almost necessary incident of the policy [to prevent excessive rents] and is traditional in English law. If the tenant remained subject to the landlord's power to evict, the attempt to limit the landlord's demands would fail" (id., at 157-158 [emphasis supplied]). The Supreme Court again appreciated the need for tenant eviction protection to have effective rent regulation in construing Federal price control legislation a generation later. "The Emergency Price Control Act was intended in part to prevent excessive rents in the public interest, and the very anti-eviction regulations under which the Administrator *409 granted the eviction certificate here were specifically designed to prevent manipulative renting practices which would result in excessive rents" (Parker v Fleming, 329 US 531, 536-537 [emphasis supplied]).
Presumably because corporate primary tenants renting apartments for residential occupancy of officers or staff (such as Lenox Hill has done here) were also subject to the legislatively defined evil of "speculative, unwarranted and abnormal increases in rents", the Legislature in enacting the RSL in 1969 did not exempt corporate tenancies from the rent regulation and tenant eviction protection benefits of that statute. Hospital and other corporate tenants remained eligible for those benefits until the enactment of the Omnibus Housing Act (OHA) of 1983 (L 1983, ch 403) (see, Koenig v Jewish Child Care Assn., 67 N.Y.2d 955; see also, 520 E. 81st St. Assocs. v Lenox Hill Hosp., 38 N.Y.2d 525). As Judge Ciparick has cogently pointed out in her dissent, the loss of the protections of the RSL and ETPA by nonprofit hospitals was "an unintended consequence of the OHA." (Ciparick, J., dissenting opn, at 415.) The relevant purpose of the OHA in requiring that the tenant on the primary lease be the occupant of any rentstabilized apartment was to forestall victimization of subtenants by "`speculative and profiteering practices'" of the primary tenants (Ciparick, J., dissenting opn, at 415 [quoting L 1983, ch 403, § 1]).
As the Bill Jacket to chapter 940 demonstrates, the Legislature could readily have considered that the evils addressed by the primary tenant residency requirements of the OHA were totally inapplicable to the nonprofit community hospitals' subletting of nearby apartments to nursing staff "with a portion of the rent being subsidized by the Hospital" (Letter from Lenox Hill Hospital, dated July 17, 1984, Bill Jacket, L 1984, ch 940, at 24). The Legislature also could readily have determined that nonprofit hospitals continued to need the protections of the RSL and ETPA. The very same housing market conditions that impelled the original adoption of rent stabilization  apartment scarcity and artificially inflated rents  created a crisis for the hospitals by jeopardizing their ability to maintain adequate staffing. "The high cost of housing and the shortage of available apartments in Manhattan has created the need for the Hospital to provide adequate and moderately priced housing in order to recruit and retain registered nurses" (Letter from Lenox Hill Hospital, dated July 27, 1984, Bill Jacket, L 1984, ch 940, at 27).
*410 Moreover, contrary to the assumption of the majority, the crisis was not unique to Lenox Hill Hospital. Mailgrams from the president, director of nursing and general medical director of Beth Israel Medical Center urging the Governor's approval of chapter 940 state:
"This legislation is essential to hospitals that rent apartments for use by affiliated health care personnel such as nurses. Failure to sign this legislation will make it impossble [sic] for us to provide safe and affordable housing for staff members. The inability to secure such housing seriously compromises our ability to service our community's health care needs" (id., at 35-37).
There is nothing in the record or legislative history to impugn the representation by Lenox Hill that enactment of the provisions of chapter 940 was "actively sought" by the Association of Hospital Housing Administrators, a group representing 20 nonprofit hospitals in Metropolitan New York (Letter from Lenox Hill Hospital, dated July 27, 1984, Bill Jacket, L 1984, ch 940, at 29).
The Legislature therefore could have concluded that removing the protections of the RSL and the ETPA from New York City's nonprofit hospitals placed the hospitals in the plight of being unable to maintain adequate nursing staff because of the loss of apartment renewals, or negotiating with the landlords (fully aware of the acuteness of the hospitals' housing needs) for renewals at artificially inflated market rental rates. When, thus, considered in its context within the statutory framework of the rent stabilization laws as a whole, and giving a fair and comprehensive reading to chapter 940's own legislative history to ascertain the ends the Legislature chose to serve in enacting it, surely chapter 940 substantially advances a legitimate State interest, even under the heightened level of judicial scrutiny applied by the majority requiring a close causal nexus between this land use regulation and "the problem sought to be ameliorated" (Rent Stabilization Assn. v Higgins, 83 N.Y.2d 156, 174).
Essentially, chapter 940 restored to nonprofit community hospitals in New York City the protections of the rent stabilization laws they previously enjoyed, against excessive rent increases and landlord profiteering (caused by artificially inflated rental market conditions), protections apparently unintentionally withdrawn by enactment of the OHA. Reinclusion *411 of New York City nonprofit hospitals within the broad class of human tenants and their successor family members subject to rent stabilization directly and undeniably serves the legislative protective and preventive goals with respect to abnormal rental increases and landlord profiteering. Indeed, as I have already shown, the legislative history of chapter 940 easily supports a legislative determination that nonprofit hospitals have special needs to be included within the protective umbrella of the RSL and ETPA.
Moreover, it was entirely reasonable to exempt nonprofit hospital tenancies from the primary tenant residency requirements of the OHA, the purpose of which was to ameliorate an entirely different problem than that addressed by the RSL and ETPA, i.e., primary tenant manipulation and exploitation of the rent stabilization laws in entering into subleases.
Chapter 940 more than satisfies any possibly required heightened level of judicial scrutiny. Its provisions, including the periodic rental increases to which landlords of the hospitals are entitled, are narrowly tailored to minimize if not totally avoid any transfer of wealth from landlords to lessee hospitals (see, Yee v Escondido, 503 US 519, 529-530, supra) as a result of the economic regulation embodied in chapter 940. The absence of any evidence in the record of an adverse economic impact upon plaintiffs as a result of the application of chapter 940 powerfully suggests that the Legislature succeeded in that effort. Certainly plaintiffs have not tendered any less restrictive legislative alternative that would accomplish the protective purposes of chapter 940.
Nor is it of any significance on the takings issue, as the majority implies, that nonprofit community hospitals were singled out among other possibly worthy institutions for the continued benefits of the rent stabilization laws. Surely maintaining the nonprofit hospitals' "ability to service [their] community's health care needs" (Beth Israel's Mailgrams, Bill Jacket, L 1984, ch 940, at 35-37), without adding to health care costs the excessive landlord profits from abnormal rent increases, merits special legislative concern. In Rent Stabilization Assn. v Higgins (83 N.Y.2d 156, supra), we deferred to the expertise of the State Division of Housing and Community Renewal as to "[t]he designation of classes of individuals to whom [the agency] has extended noneviction protection" (id., at 174). The Legislature is entitled to at least the same deference. That the majority may consider chapter 940 to be *412 "underinclusive is, of course, no justification for rejecting it" (Keystone Bituminous Coal Assn. v DeBenedictis, 480 US 470, 487, n 16, supra). "[Congress] need not control all rents or none. It can select those areas or those classes of property where the need seems the greatest" (Woods v Miller Co., 333 US 138, 145).
For all of the foregoing reasons, I conclude that plaintiffs have failed to satisfy their heavy burden of establishing the unconstitutionality of chapter 940 as a regulatory taking in its application to them.

III.
I wish to add some additional comments on the appropriate level of judicial scrutiny in regulatory takings challenges. This Court in Seawall Assocs. v City of New York (74 N.Y.2d 92, supra) read the Supreme Court's decision in Nollan v California Coastal Commn. (483 US 825) as imposing in all regulatory takings cases a heightened level of judicial scrutiny, i.e., requiring a close causal nexus between the legislative means and ends, in applying the primary per se test of whether the challenged regulation substantially advances a legitimate State interest. We unanimously adhered to that interpretation of Nollan in rejecting the facial challenge to the regulation in Rent Stabilization Assn. v Higgins (83 N.Y.2d 156, supra) and, as I have already outlined in the main body of this dissent, I am confident that chapter 940 satisfies the constitutional standard at the "close causal nexus" level of scrutiny.
Subsequent to our decision in Rent Stabilization Assn. v Higgins (supra), in Dolan v City of Tigard (512 US ___, 114 S Ct 2309) the Supreme Court reaffirmed its holding in Nollan and further explained the quantum of the close causal nexus required in Nollan. In Dolan, involving a regulatory taking claim similar in nature to that considered in Nollan, the majority held that the required nexus the municipality had the burden to demonstrate was "`rough proportionality'" (512 US, at ___, 114 S Ct, at 2319, supra) between the regulatory exaction from the property owner and the problem it addressed.
Nollan and Dolan both involved the imposition by a governmental land use administrative agency at the State or local level of conditions for discretionary approval of building permit applications by landowners, thereby requiring the landowners to dedicate property rights of permanent physical *413 occupation of their land to the general public. In both cases, the Supreme Court held that the exaction of those conditions would have constituted per se physical takings if instead they had been manifested as direct orders for the landowners to cede rights of physical occupation for some general welfare purpose (see, Nollan, 483 US, at 831, supra; Dolan, 512 US, at ___, 114 S Ct, at 2316, supra).
Prior to Dolan, some respected Takings Clause scholars interpreted Nollan as limiting its close causal nexus scrutiny to the regulatory imposition of conditions of permanent physical occupation which would otherwise constitute a per se taking (see, Michelman, Takings, 1987, 88 Colum L Rev 1600, 1608-1609; Manheim, Tenant Eviction Protection and the Takings Clause, 1989 Wis L Rev 925, 949-950, nn 146, 149; Tribe, American Constitutional Law § 9-4, at 599, n 20 [2d ed]).
My reading of Dolan leads me now to agree. First, clearly and expressly, Dolan limits its imposition of the burden on the regulator to demonstrate rough proportionality in the "`essential nexus'" (majority opn, at 394) to cases involving administrative agency impositions of suspect conditions of physical occupation. Chief Justice Rehnquist's majority opinion in Dolan states:
"Justice STEVENS' dissent takes us to task for placing the burden on the city to justify the required dedication. He is correct in arguing that in evaluating most generally applicable zoning regulations, the burden properly rests on the party challenging the regulation to prove that it constitutes an arbitrary regulation of property rights. See, e.g., Euclid v. Ambler Realty Co., 272 U.S. 365 (1926). Here, by contrast, the city made an adjudicative decision to condition petitioner's application for a building permit on an individual parcel. In this situation, the burden properly rests on the city" (Dolan, 512 US, at ___, n 8, 114 S Ct, at 2320, n 8, supra).
Second, in Dolan Chief Justice Rehnquist contrasted the typical "land use regulation [which] does not effect a taking if it `substantially advance[s] legitimate state interests' and does not `den[y] an owner economically viable use of his land.' Agins v. Tiburon, 447 US 255", with the regulatory action at issue in Dolan, where "the city made an adjudicative decision to condition petitioner's application for a building permit on *414 an individual parcel [and] the conditions imposed were not simply a limitation on the use petitioner might make of her own parcel, but a requirement that she deed portions of the property to the city" (512 US, at ___, 114 S Ct, at 2316, supra).
Finally in Dolan, the majority decision justified the application of heightened scrutiny by referring to Nollan's adaptation of the "well-settled doctrine of `unconstitutional conditions,' [under which] the government may not require a person to give up a constitutional right * * * in exchange for a discretionary benefit conferred by the government where the property sought has little or no relationship to the benefit" (512 US, at ___, 114 S Ct, at 2317, supra). The Dolan majority also invoked the conclusion in Nollan that without a close connection between the relevant governmental purpose and the required conditional dedication of property, the exaction of a land occupation dedication as a condition for a discretionary permit approval comes down to nothing more than "gimmickry" to obtain an appropriation of property by "`extortion'" without paying for it (512 US, at ___, 114 S Ct, at 2317, supra).
Since neither the doctrine of unconstitutional conditions nor the metaphor of municipal extortion masquerading as conditional land development permit approval has ever been invoked to determine the validity of rules merely regulating the use of property, I conclude that the Nollan and Dolan heightened close causal nexus judicial scrutiny is really a judicial response to the special dangers in development permit cases of abuse of the regulatory process to achieve a physical taking of an applicant's property without just compensation.
Thus, in my view, heightened, close causal nexus scrutiny should not be applied to test the validity of all regulatory taking challenges, and should not have been applied in the instant case, although I am convinced that chapter 940 of the Laws of 1984 can withstand that level of scrutiny. Until either the Supreme Court speaks definitively on whether its rule in Nollan and Dolan applies generally to all regulatory takings challenges, or this Court chooses to reappraise its reading of Nollan as so applying generally to all regulatory taking challenges, I am constrained by stare decisis to apply that level of scrutiny here, and have done so, concluding nonetheless that chapter 940 thus scrutinized is valid.
CIPARICK, J. (dissenting).
Since 1969, the New York City Council has embraced rent stabilization, "second generation *415 rent control,"[1] to ameliorate the "serious public emergency" caused by an acute rental housing shortage within New York City (Administrative Code of City of NY § 26-501). The Rent Stabilization Law (RSL) (Administrative Code § 26-501 et seq.) has consistently been repromulgated, most recently as of March 30, 1994, based on the legislative finding that this "serious public emergency" persists (Administrative Code § 26-502, as amended by Local Laws, 1994, No. 4 of City of NY § 6). Yet, rent stabilization is not intended to be a permanent, pervasive fixture in the rental housing market. To this end, amendments to the RSL have been adopted to address perceived changes in the urban rental housing market and to remedy abuses.
The enactment of the Emergency Tenant Protection Act (ETPA) in 1974 (L 1974, ch 576) and the Omnibus Housing Act of 1983 (OHA) (L 1983, ch 403) were directed at restricting the tenant's right to sublet the stabilized unit. The OHA amended the RSL (now Administrative Code § 26-504 [a] [1] [f]; § 26-511 [c] [12]) to, inter alia, exempt units not occupied by the tenant of record as a primary residence from the protections of the RSL. The OHA was adopted in response to "speculative and profiteering practices" by tenants who capitalized on their rent-stabilized leases by subletting for a profit or warehousing units in the hope of conversion to individual ownership (L 1983, ch 403, § 1). In accord with the salutary purposes of the RSL, itself an emergency response to the public housing crisis engendered by disruptive rental practices, including landlords' manipulation of rents and the supply of modestly priced housing, the OHA is designed to protect "public health, safety and general welfare" by regulating the conditions of rental occupancy to "prevent uncertainty, potential hardship and dislocation of tenants" (L 1983, ch 403, § 1).
Chapter 940 of the Laws of 1984 was enacted to remedy an unintended consequence of the OHA. Because landlords no longer had to offer renewal leases to tenants who did not use their stabilized units as their primary residence, the authorized subtenants of not-for-profit hospitals were not entitled to renewal leases, subjecting them to eviction. By amending the RSL to create an exception to the primary residence requirement *416 for not-for-profit hospitals that sublease units to their employees, the Legislature recognized that subtenancies created by not-for-profit hospitals were not susceptible to the vices the OHA intended to regulate and that the tenancies of not-for-profit hospitals are consistent with the purposes of the RSL and the ETPA. Indeed, the Division of Housing and Community Renewal (DHCR), the State agency charged with administering the RSL, recommended that the Governor approve chapter 940 (see, Letter of Div of Hous and Community Renewal Commr Yvonne Scruggs-Leftwich, Bill Jacket, L 1984, ch 940, at 14-15).
The majority declares chapter 940 unconstitutional, finding no causal nexus between chapter 940 and the RSL. I respectfully dissent and would declare chapter 940 constitutional. The close causal nexus between chapter 940 and the RSL is that chapter 940 implements a means of addressing the serious public emergency of housing people in New York City by continuing the protections of the RSL for particular tenancies already subject to rent stabilization. In this regard, chapter 940 does not suffer from any constitutional infirmity.

I.
Defendant-respondent Lenox Hill Hospital (Lenox Hill) has maintained rental apartments at 420 East 79th Street, New York City, approximately two blocks from its facility, to house affiliated employees since 1964. Lenox Hill instituted a housing program in the 1960's in order to provide convenient, safe and affordable housing for affiliated employees, such as nurses, who work shifts that can begin or end at midnight. Typically, Lenox Hill would execute leases for a number of apartments as the tenant and then sublease an apartment to its employee, who would then assume subtenancy as an incidence of employment. Lenox Hill required the employee to occupy the apartment as a primary residence. Prior to passage of chapter 940 in 1984, Lenox Hill leased approximately 210 units in close proximity to its facility for occupancy by staff members.
In 1976, plaintiffs purchased 420 East 79th Street, at which time Lenox Hill rented 18 of the 112 units. Lenox Hill is presently the tenant of record for 15 apartments, all of which are subject to the RSL. Until 1991, plaintiffs regularly extended two-year renewal leases to Lenox Hill. Prior to the December 31, 1991 expiration of six of the leases, plaintiffs *417 served Lenox Hill and the subtenants of those units with notices of nonrenewal, informing them that the leases would not be renewed because chapter 940 of the Laws of 1984 is unconstitutional and unenforceable as it purports to grant the subtenants the right to renewal leases and/or continued occupancy, and that Lenox Hill does not occupy the subject apartments as a primary residence as required by the RSL (9 NYCRR 2524.2, 2524.4 [c]). This action ensued.
The legislative history of chapter 940 demonstrates that it was designed to reinstate the pre-OHA statutory criteria and enable not-for-profit hospitals, such as Lenox Hill, to continue established housing programs. To this end, the Senate sponsor cited Lenox Hill strictly as "an example" of a not-for-profit hospital within the measure's purview (see, Senate Debates, NY Senate Bill S 9983, June 28, 1984).
Against this background, two factors are noteworthy. First, any buildings owned or operated on a not-for-profit basis by a hospital or other eleemosynary institution are exempt from regulation under the RSL (Administrative Code § 26-511 [c] [9] [c]) and the ETPA (McKinney's Uncons Laws of NY § 8625 [a] [6] [ETPA § 5 (a) (6)]). Second, the Legislature recently narrowed the range of leases subject to rent stabilization by decontrolling units that rent at $2,000 per month and whose occupants' Federal adjusted gross income exceeds $250,000 for two consecutive calendar years. While these factors may mark steps in the "transition from regulation to a normal market of free bargaining between landlord and tenant" (Administrative Code § 26-401 [a]), this course, if it continues, must be paved by the Legislature.
While rent stabilization conceptually represents an attempt to equalize the tenant's bargaining power in a scarce housing market by regulating the rental terms,[2] the practical result of rent stabilization is to redistribute the landlord's interest (see, Epstein, Rent Control and the Theory of Efficient Regulation, 54 Brook L Rev 741 [1988]; Radford, Regulatory Takings Law in the 1990's: The Death of Rent Control?, 21 Sw U L Rev 1019 [1992]). Politically, this market redistribution is accepted in *418 the form of rent stabilization as a legitimate exercise of the State's police power in response to rental housing crises, historically a vestige of World War II and, most recently, the consequence of market imbalances that create mass dislocations and shortages of affordable housing (see, Manheim, Tenant Eviction Protection and the Takings Clause, 1989 Wis L Rev 925; see also, Braschi v Stahl Assocs. Co., 74 N.Y.2d 201, 208; Block v Hirsh, 256 US 135, 156). Whether the rubric of rent stabilization is the appropriate means to address this end is a policy issue not appropriate for judicial resolution (see, Eisen v Eastman, 421 F.2d 560, 567, cert denied 400 US 841; Lincoln Bldg. Assocs. v Barr, 1 N.Y.2d 413, 415, appeal dismissed 355 US 12). It is not for this Court to question the reasonableness, propriety, wisdom or expediency of the legislative declaration that a housing emergency continues in New York City or to dismantle rent regulation on a piecemeal basis by judicial fiat where, as here, the statutory amendment is not only in harmony with the intent of the RSL and ETPA but substantially advances the State's interest in militating the relentless rental crisis in New York City (see, Federal Home Loan Mtge. Corp. v New York State Div. of Hous. & Community Renewal, 854 F Supp 151; Rent Stabilization Assn. v Higgins, 83 N.Y.2d 156, 174, cert denied ___ US ___, 114 S Ct 2693).

II.
The Supreme Court has "consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails" (Loretto v Teleprompter Manhattan CATV Corp., 458 US 419, 440; see also, Pennell v San Jose, 485 US 1, 12, n 6; Bowles v Willingham, 321 US 503, 517-518; Loab Estates v Druhe, 300 N.Y. 176, 179). Similarly, the Supreme Court has upheld the authority of State and local governments to engage in land use planning against constitutional challenge, recognizing that "`[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law'" (Dolan v City of Tigard, 512 US ___, ___, 114 S Ct 2309, 2316, quoting Pennsylvania Coal Co. v Mahon, 260 US 393, 413). Nevertheless, a governmental regulation cannot trespass the Fifth Amendment's guarantee that private property *419 shall not be taken for a public use without just compensation. This guarantee was designed to bar government from "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole" (Armstrong v United States, 364 US 40, 49 [applicable to States via Fourteenth Amendment]; see, Chicago Burlington & Quincy R. R. Co. v Chicago, 166 US 226).
A claim that a governmental act infringed upon an owner's Fifth Amendment rights is traditionally evaluated on an ad hoc factual basis (Penn Cent. Transp. Co. v New York City, 438 US 104, 124, reh denied 439 US 883). The economic impact of a governmental act upon an owner and the extent of interference with an owner's investment-backed expectations are relevant considerations in this evaluation which, as the majority states, partakes of no precise formulation (majority opn, at 392, citing Dolan v City of Tigard, 512 US, at ___, 114 S Ct, at 2319, supra). It is the opinion of this dissenter, as distinct from the analysis proffered by my dissenting colleague, that the application of these factors should not be parlayed into a discrete takings analysis.
As takings jurisprudence has evolved, the Supreme Court has identified certain intrusions as compensable "without case-specific inquiry into the public interest advanced in support of the restraint" (Lucas v South Carolina Coastal Council, 505 US ___, 112 S Ct 2886, 2893). Regulations that compel a landowner to endure a physical invasion (Yee v Escondido, 503 US 519, 526-527), and regulations that deprive a landowner of all productive or economically beneficial use of the land (Nollan v California Coastal Commn., 483 US 825, 834) constitute these types of compensable takings. However, a governmental regulation will not be found to effect a taking if it "substantially advance[s] legitimate state interests" or does not "den[y] an owner economically viable use of his land" (Agins v Tiburon, 447 US 255, 260; Dolan v City of Tigard, 512 US, at ___, 114 S Ct, at 2316-2317, supra; Seawall Assocs. v City of New York, 74 N.Y.2d 92, 107, cert denied sub nom. Wilkerson v Seawall Assocs., 493 US 976; Rent Stabilization Assn., 83 NY2d, at 171, 173, supra). A regulation that substantially advances a State interest is constitutionally sound when there is an essential nexus between the State interest and the end result of the regulation (see, Seawall, 74 NY2d, at 107, supra). In its recent plurality opinion in Dolan v City of Tigard (512 US ___, 114 S Ct 2309, supra) the Supreme Court deliberated over the level of scrutiny that governmental motivations and *420 findings should be subjected to when assessing whether such objectives are constitutionally sufficient to justify the regulation. The five-Justice majority settled on a heightened level of judicial scrutiny, identifying the measure of the nexus requirement as one of "rough proportionality" (Dolan v City of Tigard, 512 US, at ___, 114 S Ct, at 2319-2320, supra).
In concluding that chapter 940 does not advance the over-all purposes of the RSL, but rather masquerades as general welfare legislation that preserves an exclusive housing enclave for Lenox Hill, the majority impinges upon the State's prerogative to proportionally extend the scope of the RSL consistent with its declaration of emergency, and its underlying goals which are legitimate State interests deserving protection.

III.
Chapter 940 does not effect a regulatory taking and is constitutionally sound because it substantially advances the State's interest in curbing chronic rental housing shortages.
In countenancing plaintiffs' argument that they are unduly burdened by chapter 940, and characterizing chapter 940 as an unconstitutional taking, the majority overlooks the fact that the entire scheme of rent stabilization saddles owners of rental buildings with greater burdens than their unregulated counterparts in furtherance of the public health, safety and welfare, and excuses plaintiffs from a contractual obligation at the expense of tenants identified as deserving of statutory protection.
By its express terms, the RSL was promulgated "to prevent speculative, unwarranted and abnormal increases in rents * * * which creates a special hardship to persons * * * occupying rental housing" (Administrative Code § 26-501). The essential goal of the RSL is to protect and preserve certain designated tenancies from the vagaries of the marketplace. As chapter 940 is not limited to Lenox Hill but extends to all not-for-profit hospitals, it is anomalous to single out chapter 940 as "special interest legislation" since by its very nature rent stabilization bestows preferences on designated tenancies (see, Hotel Dorset Co. v Trust for Cultural Resources, 46 N.Y.2d 358, 367, 368, n 3; see also, Letter of Hospital Assn of NY State to Governor's Counsel, Bill Jacket, L 1984, ch 940, at 21 [recommending enactment of chapter 940]; Mailgrams from Beth Israel Hospital to Governor, Bill Jacket, L 1984, ch 940, at 35-37 *421 [requesting enactment of chapter 940 as essential to hospitals]; cf., 19th St. Assocs. v State of New York, 79 N.Y.2d 434).
It is a recognized policy of DHCR to require landlord-owners to offer renewal leases to corporate tenants that lease stabilized apartments for their affiliated officers, directors or employees, provided the actual occupant satisfies the primary residence requirement (see, Matter of Cale Dev. Co. v Conciliation & Appeals Bd., 94 AD2d 229, 232, affd 61 N.Y.2d 976; Matter of Sommer v New York City Conciliation & Appeals Bd., 115 Misc 2d 820, affd 93 AD2d 481, affd 61 N.Y.2d 973; Matter of Sommer v New York City Conciliation & Appeals Bd., 116 AD2d 457, 459; see also, Koenig v Jewish Child Care Assn., 67 N.Y.2d 955, 957). Consistent with this policy, DHCR supported enactment of chapter 940 as it constituted codification of existent administrative policy (see, Letter of DHCR Commissioner Scruggs-Leftwich, Bill Jacket, L 1984, ch 940, at 14-15), and ensured that currently protected tenancies would so remain.
Plaintiffs suffered no diminution of rights as a consequence. Chapter 940 in no way impairs the owners' rights to collect periodic rent increases (see, 9 NYCRR 2522.5); evict unsatisfactory subtenants (see, 9 NYCRR 2524.3); or, completely alter the use of the premise (see, 9 NYCRR 2524.5; compare, Seawall, 74 NY2d, at 108, supra).
It is precisely because the units now rented by Lenox Hill have been and will continue to be subject to the RSL that chapter 940 is causally related to the goals of the statute it amended. As Supreme Court found and the Appellate Division upheld "[t]here is no question but that the apartments are in fact rented to hospital employees [and] it is ultimately residential tenants who are being protected" (Manocherian v Lenox Hill Hosp., 154 Misc 2d 982, 991, affd 196 AD2d 728). It was plaintiffs who accepted Lenox Hill as the tenant and consequently cloaked Lenox Hill with protection against the acute rental housing shortage through their participation in rent stabilization. Chapter 940 ensures Lenox Hill will continue to receive those benefits of the RSL it currently extends to its employee-subtenants, who then escape the perils of the rental market as an incidence of employment (see, Matter of Sommer v New York City Conciliation & Appeals Bd., 116 AD2d 457, 459, supra).
The majority's assault on chapter 940's scope is further minimized in light of the blanket exception from the provisions *422 of the RSL and ETPA for housing accommodations owned or operated by nonprofit eleemosynary institutions (Administrative Code § 26-511 [c] [9] [c]; McKinney's Uncons Laws of NY § 8625 [a] [6] [ETPA § 5 (a) (6)]; cf., § 8625 [a] [11] [ETPA § 5 (a) (11)]). That the ability of these institutions to provide adequate, affordable housing to their affiliates remains unimpaired despite the broad sweep of the RSL and ETPA is indicative of the State's interest in protecting and preserving dwellings used to house affiliates of such institutions. The Lenox Hill employees, as subtenants, are entitled to the protections of the RSL and thus should not be penalized as a result of Lenox Hill's inability or unwillingness to serve as a prime landlord or owner engaged in real estate development. A legitimate goal of rate regulation, such as rent stabilization, is the protection of the "consumer's" welfare (see, Pennell v San Jose, 485 US, at 13, supra).
Therefore, it cannot be said, as a matter of law, that the goals of the RSL "to prevent exactions of unjust, unreasonable and oppressive rents and rental agreements and to forestall profiteering, speculation and other disruptive practices tending to produce threats to the public health, safety and general welfare" (Administrative Code § 26-501) are not promoted when the effect of chapter 940 is to permit an urban not-for-profit hospital to offer its health care workers convenient, safe and affordable housing that otherwise would not be available (see, 19th St. Assocs. v State of New York, 79 N.Y.2d 434, 443, supra). It is the declaration of unconstitutionality by the majority that will yield a result contrary to the RSL.
In wresting the subject rent stabilized apartments from Lenox Hill, the majority will cause the eviction of tenants from already protected dwelling space, who did nothing other than occupy their units as primary residences. By characterizing chapter 940 as a statute that diverts and subverts the equal treatment regime, the majority not only ignores the realities of rent stabilization in the urban center, but tips the balance in favor of the party that already has unequal bargaining power. This is exactly the oppressive behavior the RSL, as amended by chapter 940, seeks to forestall.
That the subtenant's occupancy is contingent on employment by Lenox Hill does not contravene the intent of the RSL, contrary to the majority's contention, as Lenox Hill's motive for maintaining the rent-stabilized units is to house its affiliated employees, not the general population. Obviously, an *423 employee on the verge of retirement or otherwise poised to sever the employment relationship has notice of the requirement that occupancy is contingent upon employment by Lenox Hill as to allow for appropriate relocation plans. In any circumstance, the subtenant would receive a standard termination notice and be afforded all substantive and procedural due process rights as required by law, including a summary proceeding in Civil Court (see, 9 NYCRR 2524.2, 2524.3).

IV.
As this Court has recognized, rent regulation creates tenancies of indefinite duration (see, Rent Stabilization Assn., 83 NY2d, at 172-173, supra). It is, therefore, of no consequence whether the tenant is an individual with a finite life span or a corporation endowed with a perpetual existence, because the same result obtains (see, Seawall, 74 NY2d, at 112, supra; Nollan, 483 US, at 837, supra). Plaintiffs, who bear the heavy burden of demonstrating that the subject enactment is unconstitutional, fail to establish by any empirical proof that the rental rates of the Lenox Hill units are any less than those of comparable units in the building as to deprive them of the economically beneficial use of their property. Indeed, plaintiffs have and will continue to voluntarily collect rents from the Lenox Hill subtenants, as well as increases "by a sum equal to fifteen percent of the previous lease rental" (Administrative Code § 26-511 [c] [12] [h]) whenever Lenox Hill executes a renewal lease, provided plaintiffs have not received any vacancy increases or surcharges in the seven years prior to the new renewal lease. Any objection plaintiffs harbor regarding the sufficiency of the 15% vacancy figure is more appropriately addressed in a hardship petition before DHCR. There is no merit to Lenox Hill's claim that plaintiffs are estopped from any such challenge to chapter 940.
I would reject plaintiffs' assertion, credited by the majority, that plaintiffs have forfeited their reversionary interests in the subject units. This contention rings hollow when confronted with the fact that the use plaintiffs intended for the property has remained constant and plaintiffs have enjoyed the security of a tenant that always pays the rent (see, Bowles v Willingham, 321 US, at 517-518, supra; Penn Cent. Transp. Co. v New York City, 438 US, at 136, supra; Rector, Wardens, & Members of Vestry of St. Bartholomew's Church v City of New York, 914 F.2d 348, 356). *424 "It is the forced occupation * * * not the identities of the new tenants or the terms of the leases, which deprives the owners of their possessory interests and results in * * * takings" (Seawall, 74 NY2d, at 106, supra; see also, Atlanta Motel v United States, 379 US 241, 261). In this regard, plaintiffs' "investment backed expectations" have been and will continue to be realized as there is no evidence that plaintiffs intend to sell or otherwise change the use of the subject apartments.
Plaintiffs have failed to demonstrate that chapter 940 effects a regulatory taking. Because chapter 940 substantially advances legitimate State interests and does not deprive plaintiffs of any economically beneficial use of their property, I conclude chapter 940 withstands constitutional scrutiny.
Accordingly, I would affirm the order of the Appellate Division.
Order reversed, with costs, chapter 940 of the Laws of 1984 declared unconstitutional and case remitted to Supreme Court, New York County, for further proceedings in accordance with the opinion herein.
NOTES
[1] See, Radin, The Liberal Conception of Property: Cross Currents in the Jurisprudence of Takings (88 Colum L Rev 1667, 1674-1678 [1988]).
[2] The Takings Clause also protects dominion interests, but this normative aspect more centrally pertains to per se, physical takings or where the claim is that a governmental condemnation of property violates the Public Use Clause of the Fifth Amendment (see, Hawaii Hous. Auth. v Midkiff, 467 US 229).
[1] The Rent Stabilization Law was adopted in 1969 as a "compromise solution" to runaway rent increases affecting some 400,000 post-1947 units previously unregulated and to allay builders' fears that rent control would be extended to new construction (see, 8200 Realty Corp. v Lindsay, 27 N.Y.2d 124, 136-137; Sullivan v Brevard Assocs., 66 N.Y.2d 489-494).
[2] It has been suggested that the function of rent stabilization is to eliminate sharp, short-term rent fluctuations while the housing market responds to a shortage over time, not to hold rents at below market levels indefinitely, and calibrated, periodic increases provide owners incentive to increase the housing supply while avoiding dramatic swings in rents (see, Cirace, Housing Market Instability and Rent Stabilization, 54 Brook L Rev 1275, 1278-1279).
[*] Designated pursuant to NY Constitution, article VI, § 2.